986 A.2d 822

COMMONWEALTH of Pennsylvania, Appellee

v.

William HOUSMAN, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2004.

Re–Submitted Feb. 25, 2008.

Decided Dec. 29, 2009.

598

David J. Foster, Costopoulos, Foster & Fields, Lemoyne, for William Housman.

Jaime M. Keating, District Attorney's Office of Cumberland County, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice EAKIN.

This is a direct appeal from a death sentence imposed on appellant for the first degree murder [1] of Leslie White, and the related crimes of kidnapping, theft by unlawful taking or disposition, unlawful restraint, abuse of corpse, and criminal conspiracy. [2] We affirm.

Shortly after graduating from high school, Leslie White, the victim, met appellant when she began working at the Wal–Mart photo shop in Mechanicsburg, Cumberland County. They began a romantic relationship; however, appellant was already involved in a romantic relationship with co-defendant Beth Ann Markman, and had been living with her for nearly two years.

Markman discovered e-mails between White and appellant, revealing their affair. Markman told appellant to end his relationship with White, and told several friends and co-

---

1. 18 Pa.C.S. § 2502(a).
2. *Id.*, § 2901(a), § 3921, § 2902(a), § 5510, and § 903(a), respectively.

workers she intended to " 'kick [White's] ass.' " *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 593 (2007). Markman's co-workers noticed bruising around her eyes and neck, which she attributed to fights with appellant over the e-mails. On one occasion, Markman called Wal–Mart to speak with White, which left White scared and crying. Markman also visited the store once, looking for White, but left without incident. Markman told a friend "if she ever got her hands on [White], she was going to kill her." N.T. Trial, 10/25/01, Vol. I, at 82. She told her probation officer,[3] Nicole Gutshall, she caught appellant cheating on her, and if she caught him cheating again, she would kill the girl.

Appellant did not terminate his relationship with White. Appellant and Markman made plans to move to Virginia for a fresh start. However, Markman became suspicious that appellant had not ended his relationship with White. Markman drove appellant in her car to a local Sheetz store, where appellant used a pay phone to call White at Wal–Mart. He falsely told White his father died, and asked her to come to console him. He told her Markman was out of town. Various Wal–Mart employees testified White received this call from appellant, and she told her co-workers appellant's father died and she was leaving work early to console him.

When White arrived at the trailer where appellant and Markman lived, appellant talked with her in the living room, while Markman hid in the bedroom until, according to her subsequent confession and trial testimony, she heard a thump and White cried out because appellant hit her hand with a hammer. Then appellant and Markman subdued White and tied her hands and feet with speaker wire, shoved a large piece of red cloth in her mouth, and used another piece of cloth to tie a tight gag around her mouth. With White bound, Markman and appellant stepped outside to smoke cigarettes and discuss their next move. Upon reentering the trailer, Markman held White down while appellant strangled her with speaker wire and the crook of his arm, killing her. During the struggle, White scratched Markman's neck. White died of

3. Markman was on probation due to a prior arrest for bad checks.

asphyxiation caused by strangulation and the rag stuffed into her mouth.

After White died, Markman wrapped White's body in a tent and placed it in the back of White's Jeep. The couple then fled to Virginia. Markman drove her car and appellant drove White's Jeep—carrying White's body. In Virginia, they drove to a remote piece of land owned by appellant's mother, then placed White's body in the trunk of an abandoned car. They discarded White's personal effects, except for her camera, which they intended to sell.

Appellant and Markman remained in Virginia for several days, staying with friends and appellant's father. Appellant continued to drive White's Jeep, which he held out as his own. While staying with Larry Overstreet and Kimberly Stultz, Markman corroborated appellant's story that they bought the Jeep from Markman's friend in Pennsylvania. At the Overstreet residence, Markman retrieved White's camera from the Jeep and they all took pictures of each other—Markman stated she bought the camera from the same woman who sold them the Jeep. Overstreet and Stultz recalled seeing scratches on Markman's neck, which Markman explained were from a dog. Stultz gave Markman the phone number of a pawn shop, and the shop owner testified he gave Markman $90 and a pawn ticket for the camera. Markman asked Stultz for cleaning supplies because "the Jeep smelled bad, like somebody had a dead animal in [it]." N.T. Trial, 10/29/01, Vol. III, at 501. Markman also told Stultz that appellant had been seeing another woman, and if she ever met this other woman, she would "whoop her ass." *Id.*, at 494. Another friend, Nina Jo Fields, testified that during the couple's visit to her home, Markman told her appellant had been cheating on her, but that she "[didn't] have to worry about the damn bitch anymore, [because she] took care of it." N.T. Trial, 10/26/01, Vol. II, at 322, 351.

After White's parents filed a missing persons report, the authorities tracked her Jeep to appellant's location in Virginia. Deputy Brian Vaughan of the Franklin County Sheriff's office in Virginia went to the house to question appellant and

Markman about the Jeep and White's whereabouts. When he saw the Jeep in the driveway, he ran the license plate number, which traced back to the Toyota Leasing Corporation.

Markman and appellant came to the door to greet Deputy Vaughan. Deputy Vaughan questioned them separately in his patrol car about the Jeep. Appellant, who was questioned first, told Deputy Vaughan he called White to ask her to console him about his dog, which had just died. Appellant said White never arrived at the trailer, and he subsequently left with Markman for Virginia. He claimed a friend loaned him the Jeep.

Subsequently, Markman voluntarily entered the patrol car and explained to Deputy Vaughan she had only seen White once, but had had several phone conversations with her. She denied knowledge of White's whereabouts, but indicated White had a bad relationship with her parents, suggesting she had run away. Markman denied knowing how appellant acquired the Jeep, and admitted driving separate cars to Virginia. When Deputy Vaughan asked Markman if she was afraid of appellant, she said she was not; rather, she admitted she had a violent temper, and appellant often had to restrain her from attacking him. She said she provoked appellant in the past and had thrown things at him, but appellant never assaulted or threatened her.

Following the police visit, appellant and Markman drove back to the property where they left White's body; there they abandoned the Jeep. Despite the couple's efforts to conceal the evidence, the police soon discovered the Jeep, as well as White's partially-decomposed body in the trunk of the abandoned car—the body was still bound, gagged, and wrapped in the canvas tent. Appellant's fingerprints were found on the car's trunk lid and license plate, a compact disc recovered from the Jeep, the Jeep's hatch, and other evidence recovered from the scene. Markman's fingerprints were found on a potato chip bag retrieved from the Jeep, and the Jeep's passenger door and rear hatch. Subsequent analysis revealed Markman's DNA under White's fingernails.

The Pennsylvania State Police obtained a search warrant for Markman's trailer and executed it; they found blood on a pillow and urine on the carpet in the place White was likely strangled. Police also discovered two lengths of speaker wire, red fibers on the floor, a piece of red cloth, a steak knife, red fibers on the knife, a tent storage bag, a hammer, and a stethoscope. Police arrested appellant and Markman on October 11, 2000, exactly one week after the murder. Police retrieved White's camera from the pawn shop and developed the film. The pictures taken at the Overstreet residence were admitted into evidence at trial; in one photograph—taken just days after appellant and Markman strangled White to death—Markman is laughing while appellant pretends to strangle her.

Following their arrest, and after receiving *Miranda*[4] warnings, Markman and appellant waived their rights and agreed to be interviewed, providing tape-recorded statements. Each independently confessed to participating in White's murder. Appellant admitted to killing White by strangling her, but claimed Markman instigated the murder to eliminate the source of one of their relationship problems and enable them to start their relationship anew. He maintained Markman directed him to tie White up and strangle her, and Markman forced compliance by hitting him with a hammer and then spinning the hammer in a threatening manner. After White died, Markman listened with a stethoscope to verify her death before wrapping the body in the tent.

In her police statement, Markman admitted she bound and gagged White and held her down while appellant strangled her. She insisted, however, appellant devised the plan to murder White in order to steal her Jeep, and he coerced her assistance by threatening to kill her with a hunting knife if she did not obey him. Markman also asserted appellant wore down her resistance by terrorizing her the night before the murder by holding a knife to her throat and forcing her to remain naked in the trailer. Markman said she only realized White was dead when White lost control of her bladder.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant moved to sever his trial from Markman's because introduction of Markman's confession to police, which was admissible against Markman, would violate his Sixth Amendment right to confront a witness against him. The trial court denied the motion. Appellant and Markman were tried on one count each of criminal homicide, kidnapping, unlawful restraint, and abuse of a corpse, and two counts of theft by unlawful taking or disposition (pertaining to the Jeep and the camera), as well as conspiracy as to all of these offenses.

Appellant and Markman each decided to advance a duress defense, trying to show they engaged in the conduct charged because they were coerced by the other through "the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist." 18 Pa.C.S. § 309(a). Upon learning Markman intended to show she acted under duress as the result of appellant's abuse, appellant filed a motion for reconsideration of the severance denial, arguing he would be prejudiced by evidence of his abuse of Markman. The trial court again denied the motion, and the joint trial began.

During the guilt phase, the Commonwealth played an audiotape of Markman's confession, altered so references to appellant were replaced with another voice saying "the other person." In her confession, Markman initially denied knowledge of White's murder, or even knowing White had been to her trailer the night she was killed. After being questioned, Markman changed her story and said appellant was helping White run away from her parents, and while Markman drove to Virginia in her car, appellant drove White to Virginia in White's Jeep. When police asked about the scratches on her neck, Markman changed her story again and said she had gotten into a fight with White the day she left for Virginia. After further interrogation, Markman confessed to her role in the murder, but blamed appellant for making her participate by threatening and terrorizing her. Markman said when White arrived at the trailer in response to appellant's phone call, she stayed out of the way until she heard White cry out

when appellant hit her hand with a hammer. Appellant then made Markman tie White up, gag her, and blindfold her. Markman said after appellant strangled White, he made her wrap White's body in the tent and put it in the Jeep. When asked why appellant killed White, Markman responded she believed he wanted the Jeep.

Markman was permitted to adduce evidence of abuse by appellant in her defense. Markman testified appellant physically abused her during their relationship, particularly in the months before the murder. *Markman*, at 596–97. She also alleged appellant terrorized her for the two days preceding the murder, during which time he cut her clothes off with a knife, repeatedly raped her, and threatened her if she did not do as he instructed. *Id.*, at 596.

Markman's testimony also included details of the night of the murder. Markman claimed that when she drove appellant to the gas station, she did not know he was planning to call White, and she attempted to escape once they returned to the trailer; however, appellant violently prevented her from leaving. *Id.* Markman stated even when White was bound and gagged, she did not know appellant was going to kill her, and she was in the kitchen getting White a glass of water when appellant strangled her. *Id.* At that time, Markman testified appellant ordered her to return the gag to White's mouth because it had slipped, and she only obeyed him because she was afraid he would kill her, too. *Id.*, at 596–97. As for her statement to Officer Vaughan that appellant had never abused her, she said she was trying to protect him. When questioned about the photograph in which she was laughing while appellant pretended to strangle her, Markman stated appellant was tickling her. *Id.*, at 597.

Based on the evidence of abuse, Markman requested a jury instruction on the defense of duress. The trial court refused because Markman placed herself in a situation where it was probable she would be subjected to duress. We disagreed, finding the jury should have been informed of the duress elements. *Id.*, at 609.

The Commonwealth also introduced a tape of appellant's confession, which was redacted so references to Markman were replaced with "the other person" in another voice. Due to an apparent oversight, there were two instances of non-redaction, where appellant's references to Markman by name remained on the tape. *Id.*, at 596 n. 5. The confession alleged Markman conceived of the plot to kill White, directed its execution, and forced appellant to cooperate. *Id.*, at 601. Appellant said Markman wanted White dead because she was jealous. He admitted he called White to the trailer because he wanted someone to talk to, and he knew he had to lie to get her to come to the trailer. After appellant talked with White for a few minutes, Markman came out of the bedroom, playing with a hammer. According to his confession, after playing with the hammer, Markman hit him with the hammer "[j]ust enough for me to feel the pain." Transcript of Redacted Taped Statement of Housman, 10/12/00, at 25. Markman directed appellant to tie White's hands, and once he was finished, she tied appellant's hands and White's feet. After blindfolding and gagging White, Markman untied appellant and they went outside to smoke a cigarette. While they were outside, according to appellant's confession, Markman said if appellant loved her, he would do as she told him. When they went back inside, Markman directed appellant to pull speaker wire around White's neck, which he did because he did not "want to die that night" in the event Markman "flipped out and wanted to hit me with a ... hammer." *Id.*, at 30. Appellant confessed to devising the plan to leave the state with White's body so they could hide it on his family's Virginia property. Markman's confession implicating appellant was similarly redacted at trial; incriminating references to appellant were removed and replaced with the same phrase, "the other person."

The trial court informed the jury the taped confessions had been altered at the trial court's direction to include the words "the other person" and they were only to consider the confession as evidence against the defendant that gave the confession. Appellant did not testify and presented no defense

during the guilt phase. He argued he lacked the specific intent to kill White because of Markman's threats and conduct with the hammer, his confession supported a third degree murder conviction, and the crimes not did not involve kidnapping.

The jury convicted both appellant and Markman of first degree murder and all other charges. Finding one aggravating circumstance, a killing committed while in the perpetration of a felony, see 42 Pa.C.S. § 9711(d)(6), the jury sentenced both to death; post-sentence motions were filed and denied. Markman and appellant filed separate direct appeals. We reversed Markman's convictions and remanded for a new trial for the murder, kidnapping, and unlawful restraint charges because appellant's redacted confession violated Markman's confrontation rights pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). See Markman, at 603, 605. We now address the issues raised in appellant's direct appeal.

As indicated, the trial court admitted appellant's audiotaped confession implicating Markman in the murder; the audiotape removed appellant's references to Markman and replaced them with the phrase, "the other person," in a voice distinct from appellant's, with the exception of two instances of non-redaction. See id., at 600–05. Based on that issue, we granted Markman a new trial for murder, kidnapping, and unlawful restraint, but affirmed her convictions for theft, abuse of a corpse, and criminal conspiracy. Id., at 605, 613. This Court held that playing appellant's confession to the jury came within Bruton, as it comprised appellant's attempt to shift the bulk of the blame to Markman, while not affording her the opportunity to cross-examine him. Id., at 603; see Bruton, at 132, 88 S.Ct. 1620 (finding admission of non-testifying co-defendant's confession, which facially incriminated defendant, violated defendant's confrontation rights because there was no opportunity for defendant to cross-examine co-defendant concerning assertions in statement).

612

This Court conducts an independent review of the sufficiency of the evidence in support of first degree murder when a death sentence is imposed. 42 Pa.C.S. § 9711(h); *Markman*, at 597. There is sufficient evidence when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to enable the fact-finder to conclude the Commonwealth established all of the elements of the offense beyond a reasonable doubt. *Markman*, at 597.

■■ To sustain a conviction for first degree murder, the evidence must establish the defendant is responsible for the unlawful killing of a human being, and the defendant acted with a specific intent to kill. *Id.;* 18 Pa.C.S. §§ 2501, 2502(a), (d). In evaluating whether the evidence is sufficient to support the conviction, the Commonwealth may sustain its burden "by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence...." *Markman*, at 598.

■ Here, the evidence showed appellant killed White by strangling her with speaker wire after he and Markman subdued her by tying her hands. Appellant and Markman wrapped White's body in a tent, and appellant put the body in White's Jeep. Appellant fled with Markman to Virginia, lied to Virginia police about the Jeep's ownership, disposed of White's body on his family's Virginia property, disposed of the Jeep on the same property when the police began investigating, and left his father's house when police began to suspect the Jeep was stolen. *See Commonwealth v. Johnson*, 576 Pa. 23, 838 A.2d 663, 681 (2003) (noting flight and concealment can constitute circumstantial evidence of consciousness of guilt); *see also Markman*, at 598 (finding evidence sufficient to sustain Markman's conviction for first degree murder for her involvement in killing White). Additionally, appellant placed the call that lured White to the trailer under false pretenses. These facts are sufficient to sustain a finding that appellant acted with the specific intent to kill White. *See id.*

Appellant further challenges the sufficiency of the evidence to sustain his convictions for kidnapping and conspiracy to commit kidnapping. As we explained in *Markman*, where we were faced with the same argument appellant currently advances, kidnapping is defined as follows:

> (a) Offense defined.—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>
> > (1) To hold for ransom or reward, or as a shield or hostage.
> >
> > (2) To facilitate commission of any felony or flight thereafter.
> >
> > (3) To inflict bodily injury on or to terrorize the victim or another.
> >
> > (4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a). Removal or confinement is unlawful if accomplished by force, threat, or deception. *Id.,* § 2901(b).

Appellant argues there was no evidence White was confined for a substantial period in a place of isolation. In Markman's direct appeal, we found "the determination of a substantial period subsumes not only the exact duration of confinement, but also whether the restraint, by its nature, was criminally significant in that it increased the risk of harm to the victim." *Markman,* at 600. We concluded it was undisputed White was not immediately killed after being tied up and was left alone in the trailer while appellant and Markman went outside to smoke cigarettes and discuss their plan. *Id.* If White had not been so confined, she might have escaped or cried for help. *Id.* The confinement period was also sufficient to cause an increased risk of harm due to the oxygen blockage from the rag in her throat. *Id.* Ultimately, we found in *Markman* that the jury was entitled to conclude "White was confined in a place of isolation for a substantial period." *Id.*

■

■ Appellant asserts the Commonwealth failed to demonstrate White was unlawfully confined in a place of isolation because she was held in the living room of a trailer located in a busy trailer park in the early evening, and her location arguably preserved for her the usual protections of society. However, appellant bound White's hands, while Markman gagged her so she could not cry out, thus confining her in a place of isolation, "separated from the normal protections of society in a manner which made discovery or rescue unlikely." *Id.* (citing Model Penal Code § 212.1, cmt. 3 (place of isolation "is not a geographical location but rather effective isolation from the usual protections of society[;]" one's own apartment in city may be "place of isolation," if circumstances of detention made discovery or rescue unlikely)). Thus, the evidence was sufficient to support appellant's kidnapping conviction. Appellant also asserts there was insufficient evidence of conspiracy to commit kidnapping because he did not kidnap the victim. For the reasons above, we likewise find the evidence is sufficient to sustain appellant's conviction for conspiracy to commit kidnapping. *See* 18 Pa.C.S. § 903.[5]

Further, appellant contends his death sentence must be vacated because the evidence failed to support the only aggravating circumstance the jury found—that appellant committed a killing while in the perpetration of the felony of kidnapping. *See* 42 Pa.C.S. § 9711(d)(6). As discussed above, the evidence was sufficient to support appellant's convictions for kidnapping

5. Section 903 provides, in relevant part:
 (a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
 (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
 (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

 * * *

 (e) Overt act.—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuant of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.
 18 Pa.C.S. § 903(a),(e).

and conspiracy to commit kidnapping. Therefore, this argument is meritless.

Next, appellant argues his trial should have been severed from Markman's because her duress defense permitted her to present substantial prejudicial evidence of uncharged conduct by appellant, which would not have been admissible if he was tried separately. Appellant argues this prejudice was augmented by the trial court's decision not to charge the jury on duress, thus exposing the jury to this evidence without the benefit of the context in which it was admitted—Markman's duress defense.[6]

The Commonwealth argues appellant and Markman were properly tried together because they did not dispute how the crime occurred. After White was killed, both explained how they concealed the body and left Pennsylvania. Because appellant and Markman consistently recounted each other's role, the Commonwealth contends their defenses, which merely claimed the co-defendants manipulated each other into participating in the crime, were not antagonistic and they were properly tried together. *See Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 213 (1997) ("The fact that hostility exists between the defendants or that one defendant may try to save himself at the expense of the other constitutes insufficient grounds to require severance."); *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1373 (1991) ("[T]he fact that defendants have conflicting versions of what took place, or the extents to which they participated in [the crime], is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together.").

Regarding the admission of evidence of abuse, the Commonwealth argues it was admissible to support Markman's duress defense, despite the court's conclusion the defense was not available to her. The Commonwealth asserts appellant was not prejudiced because the jury was capable of distinguishing between the substantial evidence supporting a first degree

6. As noted previously, *Markman* held the trial court erred in this regard and the jury should have been informed of the elements of duress. *Markman*, at 611.

murder conviction and the evidence Markman presented to minimize her role in the crimes. If the joint trial and subsequent admission of evidence was in error, the Commonwealth argues any error was harmless, as it could not have affected the verdict.

█ Rule 582 of the Rules of Criminal Procedure permits joinder of offenses or defendants:

Rule 582. Joinder—Trial of Separate Indictments or Informations

A) Standards

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

(2) Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Pa.R.Crim.P. 582(A). There is no dispute Markman and appellant participated in the same act or transactions. Where a party can show he will be prejudiced by a joint trial, "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief[.]" *Id.*, 583.

█ Whether to grant a motion for severance is within the trial court's sound discretion and "should not be disturbed absent a manifest abuse of discretion." *Chester*, at 1372. *Chester* noted joint trials are preferred where conspiracy is charged. Severance may be proper where a party can establish the co-defendants' defenses are so antagonistic that a joint trial would result in prejudice. *Id.*, at 1372–73. However, the party seeking severance must present more than a mere assertion of antagonism:

[T]he fact that defendants have conflicting versions of what took place, or the extents to which they participated in [the crime], is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together. ... Defenses become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his co-defendant.

*Id.*, at 1373 (citations omitted).

Here, the circumstances are analogous to *Chester*, in that neither appellant nor Markman denied murdering White, but disputed their role in the crime. The evidence indicated White died from the combination of appellant's strangulation and the obstruction of her airway caused by the rag Markman stuffed in her mouth. For the jury to accept Markman's defense that she committed the killing out of fear for her own life does not require the jury to completely reject appellant's version of events. The jury could have accepted appellant's and Markman's accounts. The jury could have also rejected both accounts entirely and found appellant and Markman were willing participants who later pointed the finger of blame at one another. The jury's verdict convicting appellant and Markman of first degree murder reveals it did not find their defenses so antagonistic as to compel acquittal of one defendant if it found the other guilty.

■ Regardless of the reasoning behind the jury's verdict, the fact the co-defendants blamed one another is insufficient to warrant separate trials based on antagonistic defenses. "Mere fingerpointing alone—the effort to exculpate oneself by inculpating another—is insufficient to warrant a separate trial." *Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568, 573 (1992). Indeed, if truth is the goal, having all the fingerpointing before the same fact-finder is quite efficacious.

While we do not dispute the evidence of abuse would not have been admissible at a separate trial against appellant, any prejudice to him was offset by the evidence he presented establishing Markman's violent nature. Appellant presented

evidence painting Markman as a violent and jealous individual, both older and larger than him, and alleged Markman wielded a hammer and forced his participation in the killing. He also presented evidence establishing Markman planned and instigated the killing to eliminate their relationship problems. Had he presented this evidence at a separate trial, he would make the very evidence of which he now complains relevant in rebuttal.

In addition, while the evidence of abuse could have caused the jury to infer appellant was violent, any prejudice was eclipsed by his own *admission that he violently strangled White to death* in his living room after luring her there under false pretenses, drove to Virginia with her lifeless body in her Jeep, and subsequently deposited her body in the trunk of an abandoned car. The jury was aware, based on this evidence alone, of appellant's capacity for violence. Suggestions that he intimidated Markman pale in comparison. Focusing on the possibility of mice, appellant ignores the elephant in the room.

Any prejudice resulting from Markman's admission of evidence of abuse was *de minimis*, and did not overcome the factors weighing in favor of a joint trial, nor did the prejudice outweigh the Commonwealth's overwhelming evidence supporting appellant's first degree murder conviction.[7] Again, the law favors a joint trial when criminal conspiracy is charged, *Chester*, at 1372, and the learned trial court's decision regarding severance should not be disturbed absent a manifest abuse of discretion. *Id.* Regardless of whether we would in hindsight have granted severance, there is no basis for finding

7. We are not required to grant relief when an erroneous evidentiary ruling is harmless. *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 452 (2006). An error is harmless when:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556, 561 (2002) (quoting *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1998)).

an abuse of discretion, much less one that is manifest. The court acted within its discretion in determining appellant—the party seeking severance—failed to meet his burden of establishing the potential for prejudice outweighed the interests served by a joint trial.

Appellant also asserts he was prejudiced by the admission of Markman's redacted confession in violation of his state and federal confrontation rights. Appellant contends an incriminating statement made by a co-defendant may not be admitted at a joint trial unless the confession has been property redacted to exclude references to the co-defendant, and the jury has been properly cautioned to only consider it against the co-defendant actually making the statement.

In *Bruton*, the United States Supreme Court examined whether Bruton's Sixth Amendment confrontation rights were violated when, at a joint trial, his non-testifying co-defendant's confession was introduced, and if such rights were violated, whether an instruction directing the jury to consider the confession only against the co-defendant, and not Bruton, would cure such violation. *See Bruton*, at 126, 88 S.Ct. 1620. *Bruton* held the introduction at trial of the non-testifying co-defendant's confession describing the defendant's participation in the crime deprived the defendant of his rights under the Confrontation Clause. *Id.; see also Gray*, at 197, 118 S.Ct. 1151 (prohibition on introduction of non-testifying co-defendant's confession at joint trial naming defendant as perpetrator extends to redacted confessions in which defendant's name replaced by blank space, word "deleted," or similar symbol).

The *Bruton* rule applies solely to non-testifying co-defendants. *See Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("[W]here two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."); *Nelson v. O'Neil*, 402 U.S. 622, 627, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971) ("The Constitution as construed in *Bruton*, in other words, is violated only where the out-of-court hearsay statement is that of a declarant who is

unavailable at the trial for 'full and effective' cross-examination."); *Commonwealth v. Overby*, 570 Pa. 328, 809 A.2d 295, 303 (2002) (where express implication exists in joint trial, jury instruction insufficient to cure prejudice to non-testifying co-defendant, and violates Confrontation Clause). Thus, it is evident that admission of a co-defendant's redacted confession does not violate a defendant's Sixth Amendment confrontation rights when the co-defendant takes the stand and subjects himself to full and fair cross-examination.

■■■ Here, the *Bruton* rule is clearly inapplicable. Appellant asserts the insufficient redaction of Markman's confession violated his confrontation rights; however, he fails to acknowledge this rule applies only to non-testifying co-defendants, and he also fails to acknowledge Markman took the stand at trial and subjected herself to extensive cross-examination pursuant to the Sixth Amendment and *Bruton*. Because the facts of this case and the admission of Markman's confession clearly fall outside the *Bruton* rule, appellant's assertions are meritless, and he is not entitled to a new trial on the murder, kidnapping, unlawful restraint, and conspiracy charges simply because his co-defendant received this relief.

Appellant next asserts the trial court failed to provide timely cautionary instructions regarding evidence of his abuse of Markman. The Commonwealth argues such instructions were appropriately given at the guilt and penalty phases, and appellant was not prejudiced in this regard.

■■■■ A required limiting instruction may be given either at the time limited-purpose evidence is introduced, or during the general charge. *Johnson*, at 672; *see also* Pa. R.Crim.P. 647(D) (trial judge may give limiting instruction "anytime during the trial as the judge deems necessary and appropriate for the jury's guidance in hearing the case"). It is within the trial court's discretion to determine when the instructions would be appropriate. *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1286 (2000). Prior to Markman's testimony, the trial court instructed the jury:

Ladies and gentlemen, you have heard before from various witnesses, and I guess you are going to hear again, testimony regarding possible abuse done by [appellant] to Markman.

You are allowed to hear this evidence for only one specific limited purpose, that being to assist you in determining the effect it may have had in regard to Markman's claim that she was coerced to commit criminal acts.

I specifically tell you that under the law that you may not consider this evidence or this testimony as evidence that [appellant] has bad character or a propensity to commit crimes.

N.T. Trial, 10/30/01, Vol. IV, at 889–90. The trial court also instructed the jury in the general charge during the penalty phase:

In this case, in each verdict, under the sentencing code, only the following matters, if proven to your satisfaction beyond a reasonable doubt, can be considered aggravating circumstances. That circumstance would be the same in each case. That the defendant committed a killing while in the perpetration of a felony in this case, kidnapping.

Commonwealth's Brief, at 49 (quoting N.T. Trial, 11/1/01, Vol. VI, at 1442). "There is a presumption in the law that the jury followed the instructions given by the trial judge...." *Commonwealth v. Steele*, 522 Pa. 61, 559 A.2d 904, 913 (1989) (citing *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873, 879 (1975)). Accordingly, pursuant to this presumption, the jury is considered to have followed the trial court's limiting instruction regarding the evidence of appellant's abuse of Markman, and considered only whether Markman was coerced to commit criminal acts. These instructions were sufficient to eliminate any alleged prejudice stemming from Markman's assertions of appellant's abuse.

Appellant next claims Markman's closing arguments at the guilt and penalty phases prejudiced him, as Markman's counsel essentially acted as "additional prosecutors" during the arguments. Appellant's Brief, at 61. Other than referring to

the general standard concerning closing arguments and a Kentucky case, *see id.*, at 60–61 (citing *Foster v. Commonwealth*, 827 S.W.2d 670, 683 (Ky.1991)), appellant does not rely on any other authority to support his position. The Commonwealth argues Markman's closing arguments were not prosecutorial arguments, but merely advocacy for Markman, and the jury was not prevented from making an impartial determination of appellant's guilt.

During his guilt phase closing argument, Markman's counsel noted appellant had been accused of abusing Markman. N.T. Trial, 11/1/01, at 54–55 ("When you heard about abuse, you heard it from that stand, from witnesses that spoke to each of you. [Appellant's counsel] stands up here before you and says [appellant] takes responsibility. Well, you know what, he has got a lot to be responsible for, legally and otherwise."). This statement was made in response to appellant's closing, in which his counsel argued, "They have been smearing [appellant] for the past week and a half. I'm not saying this guy is a cub scout. He is a criminal, he is a murderer. But they are smearing him in an effort to have [Markman] deny responsibility and to say she didn't do anything wrong." *Id.*, at 49–50. In his penalty phase closing, Markman's counsel noted appellant did not deny the evidence of abuse when he testified during the penalty phase in an effort to minimize Markman's role in the murder. N.T. Trial, 11/5/01, at 166–68. Appellant contends Markman's counsel's prejudicial remarks at the penalty phase included "[Markman] did bind, gagged, blindfolded ... White. But it was [appellant] that choked ... White to death and then, I suggest to you, set the rest of the agenda on the way down to Virginia." *Id.*, at 169.

The court instructed the jurors the only aggravating circumstance they were permitted to consider was whether the killing was done while in the perpetration of a felony. *See* N.T. Trial, 11/1/01, Vol. VI, at 1442. Appellant offers no reason to disturb the presumption that jurors follow the court's instructions, beyond mere conclusory statements. Appellant is merely trying to reframe his previously rejected claim he was prejudiced by the abuse evidence. As noted

previously, the evidence presented at trial was sufficient to establish appellant committed first degree murder; it was also sufficient to establish the aggravating circumstance. There is no reason to believe the verdict or punishment was the product of prejudice arising from closing arguments.

Next, appellant argues a *Simmons* instruction should be given as a matter of course prior to death penalty deliberations. *See Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (instructing jury life sentence means life without parole). Appellant also contends Markman placed his future dangerousness at issue, thus warranting a *Simmons* instruction. The Commonwealth argues Markman—not the Commonwealth—made references to appellant's future dangerousness, and this Court should not extend *Simmons* to this case.

A *Simmons* instruction is only required when the Commonwealth places a defendant's future dangerousness at issue in the sentencing phase. *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 241–42 (2007) (citing *Simmons* ). We have required a *Simmons* instruction in cases where the prosecutor made explicit references to the defendant's future dangerousness. *See, e.g., Commonwealth v. Trivigno*, 561 Pa. 232, 750 A.2d 243, 253–54 (2000) (asking jury to use prior criminal convictions as "weather vane looking into the future" and determine if "they are significant in that they are a determinant of where the man is, where[ ] he's going. . . ."). Appellant is unable to cite a single example of the prosecution arguing he is a future danger. Markman's references to past abuse were presented, not as an indication of future dangerousness, but as an argument for mitigation of Markman's participation. Furthermore, appellant does not provide any authority showing the United States Supreme Court extended *Simmons* to cases where a co-defendant allegedly places another defendant's future dangerousness at issue. Requiring a *Simmons* instruction under these circumstances would greatly expand this rule, and appellant provides no compelling reason or authority to do so.

Next, appellant claims the trial court erred in permitting the forensic pathologist, Dr. Venuti, to testify regarding White's struggle as she was murdered because there was an insufficient evidentiary basis for the testimony. Appellant concedes the cause of death was relevant, but argues whether White was struggling to free herself and get some air to breathe is irrelevant. Other than this general assertion, appellant does not explain why Dr. Venuti could not testify regarding White's struggle. The Commonwealth argues appellant was not prejudiced, and Dr. Venuti presented proper opinion testimony based on the facts.

We will not reverse a trial court's determination regarding the admissibility of evidence absent a clear abuse of discretion. *Mitchell*, at 452. Moreover, an erroneous evidentiary ruling "does not require us to grant relief where the error is harmless." *Id.* Expert testimony is allowed to "assist the trier of fact to understand the evidence or to determine a fact in issue...." Pa.R.E. 702. The evidence regarding White's struggle was introduced to assist the jury in understanding the manner of White's death. Trial Court Opinion, 5/25/04, at 91. As a forensic pathologist who performed White's autopsy, Dr. Venuti was qualified to discuss the details of White's death, and aid the jury in understanding the evidence with which it was presented. The testimony also helped explain why Markman's DNA was found underneath White's fingernails. N.T. Trial, 10/29/01, Vol. III, at 541–42. Finally, since Markman and appellant each admitted to killing White, appellant has not shown how this information prejudiced him, or how it was so unduly prejudicial as to warrant a new trial. Accordingly, the trial court did not abuse its discretion in allowing the introduction of the expert's testimony.

Next, appellant argues the trial court erred by admitting photographs he had taken with White's camera, which he stole and then sold following the murder. He claims these photographs had no probative value and were prejudicial. The photographs depict appellant making an obscene gesture of "giving the finger," and appellant pretending to strangle

Markman. The Commonwealth argues the photographs were relevant to show appellant and Markman's demeanor after the murder, and appellant was not unduly prejudiced by their admission.

We will not reverse a trial court's determination regarding the admissibility of evidence absent a clear abuse of discretion. *Mitchell*, at 452. Moreover, an erroneous evidentiary ruling does not require us to grant relief where the error is harmless. *Id.* These photographs—showing appellant and Markman on good terms following the murder—undermine appellant's argument Markman coerced him to commit the murder. Further, any prejudicial effect of the photographs is far outweighed by appellant's admission that he violently strangled White. Appellant also does not show how the admission of the photographs, in comparison to all the other evidence, warrants a new trial.

Next, appellant argues the trial court erred in refusing to suppress his statements to the Virginia State Police because he was not given *Miranda* warnings. Appellant argues he was subjected to a custodial interrogation in the police car. The Commonwealth argues appellant was not in custody and freely made statements to police; thus, no *Miranda* warnings were required. *Miranda* warnings are only required in a custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Commonwealth v. Gaul*, 590 Pa. 175, 912 A.2d 252, 255 (2006). To determine if an interview rises to the level of a custodial interrogation, we must view the totality of the circumstances to determine whether a reasonable person in the suspect's position would have believed he was under arrest. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam).

Here, Deputy Vaughan went to appellant's father's Virginia residence October 7, 2000. Trial Court Opinion, 5/25/04, at 35. Appellant and Markman emerged from the residence agreed to speak with Vaughan. *Id.*, at 36. Appellant voluntarily entered the front seat of the police car, which was unlocked,

and did not contain a cage. *Id.* Appellant was not handcuffed, restrained, or searched, and the interview lasted approximately 15 to 20 minutes. *Id.* At the close of questioning, appellant got out of the car and returned to the residence. *Id.*, at 37. Vaughan then left while appellant and Markman remained at the residence; they were not in custody. *Id.*, at 60.

It is clear a reasonable person in appellant's position would not feel he was under arrest as he freely entered and exited the police car, and spoke with the deputy while unrestrained in the front seat. Further, the interview only lasted, at most, 20 minutes, and appellant was free to leave after the interview. The trial court properly determined appellant was not subjected to a custodial interrogation; thus, *Miranda* warnings were not required and appellant's October 7, 2000 statements to Deputy Vaughan were properly admitted.

Next, appellant argues he was denied his right to counsel on October 12, 2000, when he was questioned about the murder after he was arrested for larceny involving White's Jeep. Appellant contends the right to counsel applies to all offenses relating to the same incident. Appellant also argues his statement was made more than six hours after his arrest; thus, any evidence gathered after the six-hour mark was required to be suppressed pursuant to *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301, 306 (1977) (where accused not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment not admissible). Appellant also contends his confession, which was tape-recorded by the Virginia State Police, should have been suppressed pursuant to the Pennsylvania Wiretapping and Electronic Surveillance Control Act (Pennsylvania Wiretap Act).[8]

The Commonwealth argues appellant waived his right to counsel and cannot now claim he was denied this right or that his statement was somehow coerced. Additionally, the Commonwealth asserts *Davenport*'s six-hour rule has since been abandoned in favor of the totality of the circumstances test set

8. 18 Pa.C.S. § 5701 *et seq.*

forth in *Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779 (2004). Pursuant to *Perez*, the Commonwealth argues appellant's statements were voluntarily made, and although he was originally arrested on larceny charges regarding White's Jeep, within five hours of his arrest he was questioned and made inculpatory statements regarding White's murder; thus, under the totality of the circumstances, the statements were admissible. *See id.*, at 787. The Commonwealth also argues the admission of appellant's statements did not violate either Virginia's Interception of Wire, Electronic or Oral Communications Act (Virginia Wiretap Act) [9] or the Pennsylvania Wiretap Act.

 Appellant does not argue he invoked his right to counsel after receiving *Miranda* warnings; instead, he claims his right to counsel existed because he was being questioned about the White murder, which was related to his larceny arrest. Appellant received *Miranda* warnings and waived them before making incriminating statements. Thus, there was no *Miranda* violation warranting suppression of his statements to police.

 Additionally, as the Commonwealth noted, although appellant relies on *Davenport* for the suppression of his statements, it has since been overruled by *Perez*, which held "voluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se*. Rather, ... regardless of the time of their making, courts must consider the totality of the circumstances surrounding the confession." *Perez*, at 787 (footnote omitted). In reviewing the totality of the circumstances, it must be considered whether, under the circumstances, the confession was freely and voluntarily made. *Id.*, at 785. Various other factors to consider include the interrogation's duration and means, the defendant's physical and mental state, the detention conditions, police attitude during the interrogation, and any other factors indicating whether coercion was used. *Id.*

9. Va.Code Ann. § 19.2–65.

■ *Perez* was decided March 24, 2004, prior to the trial court's opinion in the instant case; however, the general rule in Pennsylvania is to apply the law in effect at the time of the appellate decision. *See Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148 (1983) (principle applies with equal force to both criminal and civil proceedings); *see also Commonwealth v. Parker,* 435 Pa.Super. 81, 644 A.2d 1245, 1249 (1994). Furthermore, in *Perez,* we stated "[t]his rule will apply to appellant's case and all pending cases where the issue has been properly raised." *Perez,* at 788. In this case, the issue has been preserved at all times up to and including direct appeal. Additionally, the rule of retroactivity is one of judicial discretion, which should be applied on a case-by-case basis. *Blackwell v. Commonwealth, State Ethics Commission,* 527 Pa. 172, 589 A.2d 1094, 1099 (1991). In determining whether to apply a rule retroactively, courts should consider the new rule's purpose, extent of reliance on the old rule, and effect on administration of justice by retroactive application of new rule. *Id.*

■ The *Blackwell* factors weigh in favor of retroactively applying the totality of the circumstances test announced in *Perez.* The new rule and the old rule share the same purpose: "to guard against coercive interrogation and to ensure the accused is promptly afforded his constitutional rights[.]" *Perez,* at 786. At the time of the new rule's announcement, Pennsylvania courts had already abandoned the stringent bright-line rule because it was "so readily capable of avoidance as to function as no rule at all. . . ." *Id.,* at 785–86 (quoting *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 883 (2000) (Saylor, J., concurring)). As such, *Perez* did not, "strictly speaking, fashion[ ] a 'new' rule of criminal procedure[,]" *Id.,* at 790 (Castille, J., concurring). The totality of the circumstances rule was born entirely out of the six-hour rule and its litany of exceptions. *Perez*'s rearticulation of the six-hour rule merely clarified the rule's evolution. The effect of its retroactive application, unlike its predecessor, is to aid the administration of justice. Accordingly, in this case, it is appropriate to apply the rule announced in *Perez.*

██ Appellant was arrested October 11, 2000, at 10:50 p.m., on grand larceny charges regarding White's Jeep, and was detained by the Franklin County Sheriff's Office. His interrogation began at 4:19 a.m., October 12, 2000. *See* Transcript of Redacted Taped Statement of Housman, 10/12/00, at 4. Appellant was properly advised of his *Miranda* rights, signed a waiver of his rights, and gave a voluntary statement, implicating himself and Markman in White's murder. *See id.*, at 4–8. The interrogation concluded shortly after 5:08 a.m., about six hours and 20 minutes after his arrest. *See id.*, at 49–52. A thorough review of the record indicates appellant's statements were voluntary, he was cooperative, and the entire encounter was completed in about an hour to an hour and a half. *See generally id.; see also* N.T. Omnibus Hearing, 5/21/01, at 96. Thus, based on the totality of the circumstances, pursuant to *Perez*, appellant's statements to police were properly admitted, despite the length of time between his initial arrest and his confession.

██ Appellant asserts the tape recording of his statements violated the Pennsylvania Wiretap Act, and although legal in Virginia, his statements should have been suppressed. The Pennsylvania approach to conflict of law issues varies depending upon whether the laws are procedural or substantive in nature.[10] Pursuant to *Commonwealth v. Sanchez*, 552 Pa. 570, 716 A.2d 1221 (1998), where a conflict of law arises regarding procedural matters, Pennsylvania will apply its procedural laws when it is the forum state. *Id.*, at 1223. However, where a conflict exists regarding substantive laws, such as here, "Pennsylvania courts take a flexible approach which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* "This approach gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context, thereby allowing the forum to apply the

10. "As a general rule, substantive law is that part of the law which creates, defines[,] and regulates rights, while procedural laws are those that address methods by which rights are enforced." *Payne v. Commonwealth Department of Corrections*, 582 Pa. 375, 871 A.2d 795, 801 (2005) (citations omitted).

policy of the jurisdiction most intimately concerned with the outcome." *Id.*, at 1223–24.

*Sanchez* determined the issue of whether the result of a legally conducted canine sniff in California supported a search warrant in Pennsylvania, where the sniff would not have been conducted legally under Pennsylvania law. Holding California had the most interest in the canine sniff's validity, this Court noted the sniff took place there, involving a package shipped by its residents. It further stated, "No Pennsylvania state interest would be advanced by analyzing the propriety of the canine sniff under Pennsylvania law because the canine sniff did not occur in Pennsylvania and no Pennsylvania state officer was involved in the canine sniff." *Id.*, at 1224.

The Virginia Wiretap Act allows "a person to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." Va.Code Ann. § 19.2–62(B)(2). It defines oral communication as "any . . . communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectations but does not include any electronic communication[.]" *Id.*, § 19.2–61.

Appellant's statement was taken in Virginia, by the Virginia police. Both officers present during appellant's confession were parties to the recording, and one of them testified he was the consenting party under the statute. N.T. Omnibus Hearing, 5/21/01, at 84, 86. Thus, because one of the officers consented, which is all that is required by the statute, the information was obtained from appellant through valid and legal means in Virginia. Here, as in *Sanchez*, no Pennsylvania state interest would be advanced in analyzing the legality of the tape recording under Pennsylvania law because it did not occur in Pennsylvania, and none of our police officers participated in appellant's questioning. Although Pennsylvania has an interest in preventing its citizens from being tape-recorded without the proper consent, we cannot control our sister

states' otherwise legal undertakings. Therefore, Virginia is the jurisdiction having the greater interest in the legality of the recording of appellant's statement, and the substantive laws governing the Virginia Wiretap Act apply.

Moreover, the Pennsylvania Superior Court has held taped conversations between a party in Pennsylvania and a party in a sister state are admissible in a Pennsylvania court despite violation of the Pennsylvania Wiretap Act if the conversation was legally recorded in the sister state. *See Larrison v. Larrison*, 750 A.2d 895, 898–99 (Pa.Super.2000) (holding telephone conversation legally recorded in New York admissible in Pennsylvania court when recording would have violated Pennsylvania Wiretap Act); *see also Commonwealth v. Bennett*, 245 Pa.Super. 457, 369 A.2d 493, 494–95 (1976) (holding evidence legally obtained in New Jersey could be used in support of Pennsylvania search warrant when wiretap would have violated Pennsylvania Wiretap Act). Therefore, because the Virginia Wiretap Act applies, and appellant's recorded confessions were legally obtained in Virginia, the confession was properly admitted.

Finally, appellant asserts the evidence obtained in the two searches of his trailer should be suppressed because the affidavit used to procure the original search warrant contained insufficient probable cause, and the subsequent search was based on his unconstitutionally elicited confession. Appellant contends the affidavit failed to establish criminal activity occurred in his trailer regarding White's murder. The Commonwealth argues the standard regarding probable cause to issue a search warrant is well-settled, and the affidavit clearly established a basis for probable cause supporting the search warrant issued for appellant's trailer. Additionally, the Commonwealth asserts appellant knowingly and voluntarily waived his *Miranda* rights, and subsequently gave a statement to police; thus, his inculpatory statements were voluntary, and using those statements to establish probable cause was lawful.

▮▮▮▮ It is well-established that a magistrate may not consider any evidence outside of the affidavit to determine

whether probable cause exists to support a search warrant. *See* Pa.R.Crim.P. 203(B). This Court has held "[b]efore an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search . . ." and such information "must be viewed in a common sense, nontechnical, ungrudging and positive manner." *Commonwealth v. Baker*, 532 Pa. 121, 615 A.2d 23, 25 (1992). The United States Supreme Court has stated:

> The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . [concluding]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). Furthermore, probable cause is based on probability, not a *prima facie* case of criminal activity; deference should be afforded the magistrate's finding of probable cause.

Here, the affidavit of probable cause indicated White received a phone call while at work, and subsequently told her co-workers she had to leave to console appellant, whose father had just died. White's Jeep was last seen at appellant's home, as was Markman's car. White's Jeep was subsequently found at appellant's father's residence in Virginia, again with Markman's car, and White's body was discovered on land belonging to appellant's family. *See* Affidavit of Probable Cause, Trooper Sally A. Worst, 10/9/00. The facts presented in the affidavit create the probability that evidence of White's murder would be found in appellant's trailer, and because great deference is due the issuing magistrate, the search warrant issued was supported by sufficient probable cause.

Having concluded that appellant's claims for relief are without merit, pursuant to 42 Pa.C.S. § 9711(h)(3), we must affirm the sentence of death unless we determine the sentence was the product of passion, prejudice, or any other arbitrary factor, or the evidence fails to support the finding of at least one aggravating factor. *Id.* Upon review of the record, we conclude the sentence of death was not the product of passion, prejudice, or any other arbitrary factor. Rather, it was based upon evidence properly admitted at trial. We also conclude the evidence was sufficient to support the finding of at least one aggravating factor, that appellant committed a killing while in the perpetration of a felony. Accordingly, we affirm the determination of guilt as to all counts, and affirm the sentence of death.

Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within 90 days, the complete record of this case to the Governor of Pennsylvania.

Judgment of sentence affirmed.

Chief Justice CASTILLE and Justices TODD, McCAFFERY and GREENSPAN join the opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice BAER files a dissenting opinion.

Justice SAYLOR, concurring and dissenting.

I join the result reached by the majority insofar as it affirms Housman's convictions, but respectfully dissent from the denial of relief as to the death sentence.

While I agree with Mr. Justice Baer, writing in dissent, that the trial court's error in failing to sever Appellant's trial from that of co-defendant Beth Ann Markman was substantially prejudicial when viewed in isolation, in the present matter the Commonwealth's case against Appellant for first-degree murder was overpowering. Significantly, the prosecution was not premised on circumstantial evidence or identification testimony. Rather, it was undisputed at trial that Housman placed

the phone call luring the victim to the trailer and that he intentionally strangled her there. His defense was merely that he was frightened into doing this. His purported "fright," however, amounts to something short of coercion, because at trial he conceded that he was criminally liable for third-degree murder, which subsumes a malicious mental state. Thus, he did not pursue a conventional duress defense. Further, the only evidence that Housman was hit *and/or* threatened during the episode was exceptionally weak, since it derived solely from his own self-serving statement to police, brought onto the record during the prosecution's case-in-chief. Indeed, Housman did not testify at trial to create a credibility issue under *Commonwealth v. Young,* 561 Pa. 34, 87 & n. 16, 748 A.2d 166, 194 & n. 16 (1999) (reargument opinion), as did Markman.

Given the remarkable strength of the Commonwealth's case for first-degree murder, the absence of any viable defense or testimony creating a credibility issue, and with full appreciation that the prejudice resulting from the trial court's refusal to sever was substantial, I conclude that such error may be deemed harmless for purposes of preserving Housman's convictions under the third method of establishing harmless error referenced by both the majority and the dissent. *See* Majority Opinion, *op.* at 618 n. 7, 986 A.2d at 835 n. 7; Dissenting Opinion, *op.* at 645–46, 986 A.2d at 851–52 (Baer, J.).[1] However, in light of the significant possibility of spillover prejudice which may have affected the penalty determination, I would vacate Housman's death verdict and remand for a new sentencing hearing.

Justice BAER, dissenting.

The Majority affirms the direct appeal from a sentence of death imposed by the Cumberland County Court of Common Pleas following Appellant William H. Housman's conviction for the first-degree murder of Leslie White and the related crimes of kidnapping, theft by unlawful taking or disposition, unlawful restraint, abuse of corpse, and criminal conspiracy. I believe

1. I also agree with the majority that Housman's other guilt-phase claims are meritless.

the trial court erred in denying Appellant's motion to sever his trial from that of his co-defendant, Beth Ann Markman, because of the prejudice that resulted to Appellant from the introduction of Markman's evidence, and that the error was not harmless. Accordingly, I would reverse the conviction and remand for a new trial.

As the Majority notes, Appellant's counsel learned pre-trial that Markman intended to offer the defense of duress and evidence in support thereof at trial, arguing that she suffered long-term physical and emotional abuse at the hands of Appellant. Appellant's counsel filed a motion for reconsideration of the denial of severance, arguing that the evidence of abuse Markman intended to introduce at trial was not legally or factually relevant to Appellant's guilt in this capital case and would, in fact, be severely prejudicial. The evidence that counsel anticipated Markman presenting, and which counsel brought to the court's attention, included statements from a neighbor relating that Markman described how Appellant had wrapped a telephone cord around her neck, that she saw Markman with bruises and black eyes which were attributed to Appellant, and that she observed Appellant trying to sabotage Markman's car. Another neighbor was to testify to hearing constant fighting between Markman and Appellant, and a friend and neighbor was to relate that Markman had told her that Appellant had tortured Markman for an entire night, had taken a knife and cut her down the chin, neck, stomach, and legs, had gagged her with underwear and tied her up, and that the neighbor had seen the cuts and bruises that had resulted from these attacks.

A different friend was to testify that Markman had complained to her about the abuse, and she had suggested that Markman obtain a protection from abuse order. A colleague of Markman's was to testify that Markman complained of abuse by Appellant and often came to work black and blue. Another friend was to testify that one time when Appellant got angry with Markman, he threatened to cut her brake lines, and another time stated that he wanted to kill her. Counsel further argued that the prejudicial effect of this evidence of abuse, which would not be admissible against Appellant in a

separate trial for the alleged murder, could not be cured by any cautionary instruction. The trial court denied the motion for reconsideration, and, as expected, Markman introduced at trial all of the foregoing evidence of Appellant's alleged abuse of her, along with additional evidence of such abuse. Importantly, the trial court declined to instruct the jury during its charge regarding Markman's defense of duress.

Appellant presently argues that his trial should have been severed from Markman's because her antagonistic defense of duress, though ultimately disallowed by the trial court, permitted Markman to present substantial prejudicial evidence of his uncharged conduct that would not have been admissible if he was tried separately. Appellant asserts that, consequently, the joint trial resulted in the same jury charged with deciding his fate being subjected to days of testimony and argument of his alleged physical, verbal, and other abuse of Markman, painting him as a sadistic monster with evidence irrelevant to the murder for which he was on trial. Appellant argues that the resulting prejudice was even more acute, if possible, because the trial court ultimately refused to charge the jury on Markman's defense of duress, therefore allowing it to hear the evidence without an instruction defining the context for which it was offered. The Majority rejects Appellant's argument.

Reading Rules 582[1] and 583[2] of the Rules of Criminal Procedure together, it is apparent that joint trials of co-

---

1. Rule 582. Joinder—Trial of Separate Indictments or Informations
 A) Standards
 (1) Offenses charged in separate indictments or informations may be tried together if:
 (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
 (b) the offenses charged are based on the same act or transaction.
 (2) Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.
 Pa.R.Crim.P. 582(A).

2. Pa.R.Crim.P. 583 provides "[t]he court may order separate trials of offenses or defendants or provide other appropriate relief, if it appears

defendants are proper where (1) the defendants are alleged to have participated in the same act or transaction or series of acts or transactions, and (2) a defendant will not be prejudiced by being tried jointly with the other defendant. There is no dispute here regarding whether Markman and Appellant participated in the same act or transaction. The question here is one of prejudice, and it is on that question that I respectfully but strongly disagree with the Majority.

The question of prejudice involves a balancing test, where interest in judicial economy is balanced against the need to minimize prejudice against a defendant. *Commonwealth v. Patterson*, 519 Pa. 190, 546 A.2d 596 (1988). Generally, joint trials are encouraged when judicial economy will be promoted by avoiding the expensive and time-consuming duplication of evidence. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491 (1995). In addition, where, as here, conspiracy is charged, joint rather than separate trials are preferred. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1372 (1991); *Jones*, 668 A.2d at 501; *Patterson*, 546 A.2d 596.

Although judicial economy would be served by a joint trial, that is only one side of the equation. "This interest in judicial economy must be balanced against the need to minimize prejudice that may be caused to a defendant by consolidation." *Patterson*, 546 A.2d at 600. Where the defendant can show that he will be prejudiced by a joint trial, severance may be proper. *Jones*, 668 A.2d at 501. The "prejudice" of which Rule 583 speaks is not the ordinary prejudice that a defendant suffers from being charged with a crime; rather, the prejudice of Rule 583 is "that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 499 (1988). The potential for prejudice resulting from a joint trial exists where the evidence introduced against one defendant would be inadmissible against the other. *Commonwealth v. Lambert*,

that any party may be prejudiced by offenses or defendants being tried together."

529 Pa. 320, 603 A.2d 568, 573 (1992) (recognizing that separate trials for co-defendants should be granted where the evidence is such that, while it will be introduced against one defendant, it will not be admissible against others).

The Rules of Evidence prohibit introduction of prior bad acts to demonstrate conformity. *See* Pa.R.E. 404(b)(1) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith"). Normally, in criminal trials, evidence of prior crimes or bad acts committed by a particular defendant is not admissible and any reference to it constitutes reversible error. *See Commonwealth v. Allen,* 448 Pa. 177, 292 A.2d 373, 375 (1972) (noting that the prosecution may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt on the present charge). The purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes, he was more likely to commit that crime for which he is being tried. *Commonwealth v. Trowery,* 211 Pa.Super. 171, 235 A.2d 171, 172 (1967); *see also Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004) (observing that evidence of prior bad acts are not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes); *Commonwealth v. Fisher,* 564 Pa. 505, 769 A.2d 1116, 1128 (2001), *cert. denied* 535 U.S. 906, 122 S.Ct. 1207, 152 L.Ed.2d 145 (2002) (same).

Evidence of Appellant's abuse of Markman, introduced by Markman in her defense, would not have been admissible in a separate trial because it consisted of evidence of prior uncharged conduct and bad acts and tended to demonstrate Appellant's criminal propensity, thereby prejudicing him. Markman attempted to paint Appellant as an abusive boyfriend who conceived of and directed the murder of his former girlfriend in the same manner Appellant had previously abused Markman. Markman's defense required her to demonstrate Appellant's abusive propensity and violent characteristics. Thus, where she was tried with the man whom she

accused of such extensive abuse, the jury was clearly exposed to the facts averring that Appellant had previously committed violent abuse against one girlfriend, Markman, even going so far as to choke her with wire, the exact method by which he carried out the murder of his other girlfriend, the victim. I believe, therefore, that Appellant demonstrated that the evidence of abuse Markman intended to offer and did, in fact, present, was overwhelmingly and unduly prejudicial.[3]

This situation is distinguishable from that presented in *Chester*, 587 A.2d 1367, on which the Majority relies, and in *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 771 (1998), and *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 213 (1997), on which the Commonwealth relies. In those cases, the evidence admitted in the joint trial would have been admissible in a separate trial. Therefore, there was no need to analyze the prejudicial effect of such evidence. Similarly, I do not believe that here we have mere fingerpointing, as the Majority does. Rather, we have an entire trial tainted by the co-defendant's defense, received without context, demonstrating Appellant's systematic, unrelenting, abusive, criminal behavior to one girlfriend in a trial for the murder of a second

---

**3.** The Majority concludes that evidence of Appellant's abuse of Markman would have been admissible in a separate trial against Appellant to rebut his argument that he lacked the specific intent to kill the victim. I disagree. If, in separate trial, the Commonwealth sought to respond to counsel's argument that Appellant lacked the specific intent to kill because Markman coerced him with the threat of force, the Commonwealth could have fairly have done so with evidence that Appellant was not under duress when he killed the victim. It could have, for example, called Markman to refute Appellant's argument that she coerced his compliance. It could not have paraded in witness after witness over the course of several days to testify to Appellants' long term, abusive conduct towards Markman. As discussed above, the prejudicial impact of such evidence outweighs its probative value. *See* Pa.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."); *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 151 (2008) (citing the comment to Rule 403 that "Unfair prejudice" means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially.).

girlfriend. Such evidence amounts to far more than mere suggestions of intimidation. *See* Majority Op. at 616–18, 986 A.2d at 834–35.

In *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the high Court opined that when defendants have properly been joined, a district court should only grant severance if there is a serious risk that a joint trial "would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. The Court went on to say that where evidence is admitted at a joint trial that would not be admissible in a separate trial, a defendant might be prejudiced:

Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh,* less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. [See 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ].

*Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 (internal citations omitted).

I believe that this case is representative of those situations in which the U.S. Supreme Court thought the risk of prejudice

is high. In fact, it would be difficult to imagine a situation more prejudicial to a defendant than one in which the evidence that would be inadmissible in a separate trial is admitted not *against* the codefendant but, rather, *by* the codefendant, in an attempt to shift the blame for the murder of Appellant's former girlfriend from herself to Appellant by demonstrating that Appellant forced her participation in the murder. This evidence of wrongdoing on the part of Appellant, presented as part of the co-defendant's defense, could "lead the jury to conclude that a defendant is guilty" even more so, I believe, than evidence of other wrongdoing on the part of a co-defendant. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. *See also Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981) (applying Pa.R.Crim.P. 582(A)(1) to find that judicial economy cannot be elevated above the integrity of the factfinding process, and holding that to allow inadmissible evidence that is "irrelevant and prejudicial" to influence a verdict in the name of judicial economy is "abhorrent to our sense of justice."); *Foster v. Kentucky*, 827 S.W.2d 670 (Ky.1991) (holding that in a joint trial where a co-defendant sought to advance the defense of coercion based on abuse by the appellant, the trial court properly precluded evidence of uncharged criminal misconduct by the appellant, but that in the penalty phase, the trial court erred by permitting such evidence of abuse, finding that the evidence was highly prejudicial and required severance).

Generally, an instruction to the jury to consider evidence only with respect to the defendant against whom it is offered is sufficient to remove any potential prejudice. *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Commonwealth v. Travers*, 768 A.2d 845, 847 (Pa. 2001). Therefore, "[w]hen charges against several defendants are consolidated for trial ... the trial judge must exercise extreme care that evidence admissible against one defendant is not improperly received against another." *Commonwealth v. Scarborough*, 313 Pa.Super. 521, 460 A.2d 310, 313 (1983). Although in some situations a cautionary instruction is not sufficient to cleanse prejudice, these situations are the excep-

tion, not the rule. *See Richardson*, 481 U.S. 200, 107 S.Ct. 1702; *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions . . . there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").

Having chosen to deny the motion for severance and permit admission of evidence of abuse, the trial court could have provided jury instructions in an attempt to overcome the extensive prejudicial effect of the testimony that was ultimately presented by Markman.[4] That evidence, as predicted in Appellant's motion to sever, included testimony from Deborah Baker, a friend of Markman, that she saw bruises on Markman beginning in 1999, which became progressively worse into the summer of 2000, and that Markman was "scared to death" of Appellant. Several of Markman's colleagues testified that Markman indicated that her boyfriend was abusive, and that Markman came to work upset and with bruises and black eyes. One colleague testified that she saw Markman on one occasion with bruises on her ears and arms, a black eye, and, on another occasion, with bruises all over her body, which Markman attributed to Appellant's abuse. When Markman tried to evict Appellant from the trailer, this witness was there to ensure Markman did not get hurt.

The manager of the trailer park where Markman and Appellant lived testified that when Markman wanted to remove Appellant's name from the lease because they were not getting along, Appellant hit Markman in the mouth and nose. The manager also testified to seeing bruises on Markman, and to witnessing a fight on October 2, 2000, to which police responded. An emergency room nurse testified that Mark-

4. Given the extreme prejudice to Appellant from this pervasive testimony, I am unwilling to conclude that a curative jury instruction would have cured the error. As such instruction was not even given, it is unnecessary to confront that question.

man came to the hospital on August 10, 2000, for treatment of two black eyes and complaining of dizziness and nausea. A neighbor in the trailer park testified that she saw Markman with black and blue marks and significant swelling on her face. Another neighbor testified to witnessing Appellant put Markman in a choke hold, bang her head on the wall, and throw her to the floor. Another neighbor, who also saw bruises all over Markman, testified that Markman's eyes were so black that Appellant called her a raccoon.

Markman herself then testified regarding her relationship with Appellant. Shortly after Markman took the stand and began to testify about the abuse she suffered, Appellant's counsel objected to this testimony. The prosecutor then indicated the he did not think the evidence was relevant to the issue of Appellant's guilt, and requested a cautionary instruction. The trial court instructed the jury as follows:

> Ladies and gentlemen, you have heard before from various witnesses, and I guess you are going to hear again, testimony regarding possible abuse done by [Appellant] to Markman.

> You are allowed to hear this evidence for only one specific limited purpose, that being to assist you in determining the effect it may have had in regard to Markman's claim that she was coerced to commit criminal acts.

> I specifically tell you that under the law that you may not consider this evidence or this testimony as evidence that [Appellant] has bad character or a propensity to commit crimes.

N.T. 10/30/2001 at 889–90. Counsel for Appellant objected that he did not believe the cautionary instruction was adequate. *Id.* Beyond this isolated statement, the court gave no further instruction in this regard, notably not again mentioning the subject during its charge to the jury.

Markman proceeded to testify that Appellant's abuse began early in their relationship with pushing and shoving. She testified that in 1999, Appellant threw her to the floor in front of her daughter. The abuse escalated when Appellant began

punching Markman in the side of her head, and began regularly to grab and squeeze her arms, and grab her by the throat and push her against the wall. Beginning in late 1999 and escalating into 2000, Appellant started hitting Markman more with his fists on her head and body, causing bruising and swelling. In the summer of 2000, the abuse got worse. When asked what he would do, Markman replied: "Pushing, grabbing me by the throat, put me up against the wall. Grab me around my throat. Like this (indicating) like a half Nelson type thing. Flip me over to the floor. While he had his hand around my neck, he would have his hand covering my nose and my mouth." He would threaten to snap her neck if she was not quiet. Markman testified that Appellant threatened her life several times, and once caused her to go to the emergency room because of bruises to the head, black and blue marks, and dizziness. She also testified that she attempted to obtain a protection from abuse order against Appellant but did not follow through for fear of Appellant's anger. Markman further testified that during a fight over Appellant's relationship with the victim, Leslie White, Appellant pinned her against the wall, grabbed her, put wire around her throat, and threatened her. He told her that it was her fault he was the way he was, and proceeded to carry her into the bedroom and rape her.

Markman continued her testimony, detailing the events that happened in the days leading to the murder. She explained that on October 2, 2000, just two days before the murder, when she decided to evict Appellant from the trailer, he pulled wires from her car. A day or two later, she returned to her trailer and found Appellant inside. He grabbed her by the throat, squeezed, and held a knife against her throat, until she began to black out. He used the knife to cut off her clothes, ran the knife down her body, and raped her. When he was finished, according to Markman's testimony, he tied her up, stuffed underwear in her mouth, and let her sleep. He threatened that if she told anyone about what he had done, he would "put a .45 in your [Markman's] head." Markman testified that Appellant told her he was leaving, but before he

left he wanted Markman to drive him to a phone to make a phone call. During the trip to the convenience store from which the call to White was placed, Markman testified that Appellant held a knife to her and forced her to drive him. Markman proceeded to detail how Appellant forced her to participate in murdering White, which, as discussed above, she testified that she participated in out of fear of Appellant. At the conclusion of Markman's defense, the trial court inexplicably concluded that the evidence did not support the defense of duress, and declined to instruct the jury accordingly.

In light of the extensive evidence of abuse, I would find that the passing cautionary instruction, delivered mid-trial at the request of the prosecutor, was wholly insufficient to ameliorate the extreme prejudice that resulted from Markman's defense of duress, copiously delivered during the joint trial. In this case, where Appellant was on trial for murdering his former girlfriend by strangling her with his arm and speaker wire, and his current girlfriend was permitted to introduce unrebutted evidence of Appellant's abuse, including Appellant's choking her with his arm and wire, considering all of the circumstances under which the irrelevant evidence was given and its probable effect on the jury, *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162, 1165 (1981), including the nature of the crime, *Commonwealth v. Morris*, 513 Pa. 169, 519 A.2d 374, 377 (1986), the trial court's brief cautionary instruction during Markman's testimony was insufficient to cure the prejudice caused by such evidence. *See Bruton*, 391 U.S. 123, 88 S.Ct. 1620 (concluding that admission of co-defendant's confession that implicated defendant at joint trial constituted prejudicial error even though trial court gave clear, concise and understandable instruction that confession could only be used against codefendant); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (holding that reversal follows if a confession admitted in evidence is found to be involuntary, regardless of possibility that jury correctly followed instructions and determined confession to be involuntary); *Commonwealth v. Chacko*, 480 Pa. 504, 391 A.2d 999 (1978) (where jury's reaction to photographic evi-

dence was more likely to be emotional rather than rational, the trial judge's cautionary instructions to jury on admitting photographs could not cure prejudicial effect); *Commonwealth v. Archambault*, 448 Pa. 90, 290 A.2d 72, 75 (1972) (holding that where the judge told the jury that it would be a miscarriage of justice not to find the defendant guilty, cautionary instructions that the jury is the final arbiter of the verdict were insufficient).

Finally, I do not believe that the trial court's failure to sever Appellant's trial from Markman's was harmless error. *See Markman*, 916 A.2d at 603 (defining harmless error as (1) the error did not prejudice the defendant or the prejudice was *de minimus;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict). As explained, Appellant was prejudiced by the joint trial and the subsequent admission of evidence by Markman demonstrating Appellant's criminal propensity, and I do not believe the prejudice can be considered *de minimus,* as the Majority concludes. Rather, Markman's entire defense was premised upon portraying Appellant as violent and abusive.

Moreover, the erroneously admitted evidence of abuse was not merely cumulative of other properly presented evidence. Without the evidence of abuse presented by Markman the jury would not have been made aware of Appellant's alleged abusive propensity. Finally, the remaining uncontradicted evidence of guilt was not so overwhelming and the error's prejudicial effect was not so insignificant by comparison that the error could not have contributed to the verdict. Appellant's defense, as articulated to the jury through the reading of his confession, was that Appellant lacked the specific intent to kill and acted only because Markman coerced him. Thus, the issue was whether Appellant acted with the specific intention to bring about the kidnapping and murder of White. His

credibility in this regard would determine whether the jury found him guilty of first degree murder. His position that he was coerced by Markman could not stand next to the extensive portrayal by Markman of Appellant as abusive and the mastermind of the murder. In this regard, in Markman's appeal, we held that Markman was prejudiced by the joint trial with Appellant due to the introduction of Appellant's redacted statement. *Markman,* 916 A.2d at 603. In reaching this conclusion, we specifically found that Markman's and Appellant's defenses were irreconcilable:

> [F]or purposes of ascertaining [Markman's] guilt, the central issue as to both the murder and the kidnapping was whether, and to what extent, [Markman] acted with an intention to bring about the kidnapping and killing of White. The degree to which the jurors would believe [Markman's] account of the underlying events, as recited both in her confession and in her trial testimony, would therefore determine whether they would find her guilty of these crimes, including whether they would conclude that she acted with a specific intent to kill. On this topic, Housman's confession represented the only proof directly refuting [Markman's] claim that Housman forced her against her will to harm White. Indeed, [Markman's] and Housman's accounts of the central facts were irreconcilable. In contrast to [Markman's] account, Housman's confession painted [Markman] as the individual who directed all of the crucial events to accomplish the binding and killing of White.

*Markman,* 916 A.2d at 603.

Accordingly, because I believe that the trial court erred in denying Appellant's motion to sever, and that the trial court's cautionary statement was insufficient to cure this harmful error, I would remanded for a new trial, and would not reach the remaining issues addressed by the Majority.[5]

5. Appellant further argues that he was prejudiced in the penalty phase by the trial court's decision not to sever and to allow additional evidence by Markman regarding Appellant's abuse. Appellant specifically refers to Markman's expert testimony regarding the trauma Markman endured from Appellant. I do not believe the Majority sufficiently addresses this argument, and, as expressed *infra,* I am skeptical that the

trial court's penalty phase instruction could have cured the prejudice to Appellant. As I would remand for a new guilt-phase trial, I would grant Appellant a new penalty phase proceeding.