J-A11034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DARNELL MARCUS LATHON :
:
Appellant : No. 583 MDA 2024

Appeal from the Judgment of Sentence Entered March 19, 2024
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002477-2022

BEFORE: MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JUNE 09, 2025**

Appellant, Darnell Marcus Lathon, appeals from the judgment of

sentence entered in the Court of Common Pleas of Lancaster County following

his conviction by a jury on the charges of aggravated indecent assault-without

consent, aggravated indecent assault-complainant unconscious, unlawful

contact with a minor-sexual offenses, corruption of a minor, indecent assault-

person unconscious, and indecent assault-without consent.[1]  After a careful

review, we affirm.

The relevant facts and procedural history are as follows:  Following the

sexual assault of the victim, the Commonwealth filed an Information charging

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3125(a)(1), 3125(a)(4), 6318(a)(1), 6301(a)(1)(ii),
3126(a)(4), and 3126(a)(1), respectively.

Appellant with the aforementioned crimes. On October 26, 2022, Appellant filed a pre-trial motion seeking to suppress the results of DNA testing, and on November 16, 2022, the trial court denied the suppression motion.

On December 4, 2023, Appellant, represented by counsel, proceeded to a jury trial at which the victim testified. Specifically, the victim testified that Appellant is her second cousin, who is four years older than her. N.T., 12/4/23-12/5/23,[2] at 93. She testified that her and Appellant's immediate families were close with each other; however, she did not often spend time alone with Appellant. *Id.* at 94. When she became a teenager, Appellant and his friends would sometimes "hang out" and drink alcohol with the victim and her friends. *Id.* She noted that, when she was underage, Appellant would buy alcohol for her and her friends. *Id.* at 95.

The victim testified that, on November 22, 2019, when she was seventeen years old, she and two friends (Kennedy and Kaytlynn) were drinking Bacardi in her bedroom as they got ready for a party. *Id.* at 97. The victim texted Appellant and made a tentative plan for their groups to meet after the party. *Id.* at 107. The victim testified she consumed "at least half of the bottle of Bacardi," and at 9:00 p.m., Kennedy drove the trio to the party, which was about ten minutes from the victim's house. *Id.* The victim

---

[2] The notes of testimony for the first and second days of trial were combined into one volume.

took Bacardi in a water bottle to the party, and she consumed it. *Id.* She also drank punch mixed with alcohol. *Id.*

At approximately 11:40 p.m., Kennedy and Kaytlynn took the victim, who was highly intoxicated, back to her house. *Id.* at 99. The victim recalls both friends helping her into her bedroom. *Id.* The victim did not invite anyone else back to her house, and when she entered her bedroom, no one was in her bedroom. *Id.* at 100. The victim testified that, as soon as she laid on her bed, she "blacked out" and does not remember her friends leaving her bedroom. *Id.*

The victim recalls waking up during the night and vomiting over the side of her bed. *Id.* at 101. She also recalls waking a second time, hearing the jingle of her doorknob, opening her eyes, and seeing a "dark, shadowy figure." *Id.* The victim testified it felt like a scene from a movie, and she fell back to sleep immediately. *Id.* at 102.

On November 23, 2019, at approximately 8:00 a.m., the victim awoke and, after getting out of bed, she noticed her leggings and underwear were ripped near her "private parts." *Id.* The victim testified she immediately realized something "had happened to her," and she called her older sister, who told her not to take a shower, drink anything, go to the bathroom, or change her clothes. *Id.* at 103. The victim's sister indicated she would take her to the hospital. *Id.* at 105. The victim noted she takes a shower every day, and she had showered just prior to the party, as well as both days before

- 3 -

the party. *Id.* However, she did not shower after the party or prior to her sister taking her to the hospital on November 23, 2019. *Id.*

The victim testified that, at the hospital, a rape kit was completed. *Id.* She gave statements to the police, and she gave them the clothes she had been wearing. *Id.* A police officer came to her house that same day and collected her bed sheets, as well as her comforter. *Id.* The victim confirmed she told the police she suspected Appellant had assaulted her. *Id.* at 106. The victim testified she voluntarily gave the police her cell phone, and they examined her text messages. *Id.* at 112.

The victim confirmed that, on November 21, 2019, at 1:28 p.m., she texted Appellant to inquire as to whether he would get her alcohol. *Id.* On November 22, 2019, at 12:54 p.m., she sent him a text indicating she wanted "Bacardi. Peach Svedka. If Svedka [is] on sale, get two. Coconut Malibu." *Id.* at 113. The victim testified she met Appellant, and he purchased Bacardi, which she consumed later that night. *Id.* at 114. Further, at 11:39 p.m., the victim sent a text message to Appellant indicating she was at a party, and Appellant responded he was on the way to a bar. *Id.*

At 12:15 a.m. on November 22, 2019, the victim texted Appellant, "whenever after that." *Id.* Appellant texted back (verbatim), "Bet. I'll let you know if they wanna come but I'm def to after if I'm able to drive." *Id.* at 115. The victim responded, "We are so drunk." *Id.* Appellant responded (verbatim), "I can tell by how you are texting, lol, lol. But bet I'll let you know

after the bar but I'm def cause I got some alc too and y'all got hell alc so we gunna get sauced." *Id.* Thereafter, at 1:56 a.m., Appellant texted, "Slumped?" *Id.*

The victim did not respond to Appellant's text message until 8:22 a.m., at which time she asked Appellant if he had come into her room during the night. *Id.* Appellant responded, "No." *Id.* at 116. He then sent a text message indicating (verbatim), "[B]roo you're mad weird for tryna accuse me of something I never did when I was with my boys the whole night on Friday….I never said I was coming over. I passed out around 2. So, I'd appreciate if you weren't spreading rumors." *Id.*

The victim testified she did not text Appellant again because she suspected he had sexually assaulted her. *Id.* at 117. She noted her suspicions were based, in part, on his past behavior, including sneaking into her bedroom multiple times while she was asleep and sucking on her toes. *Id.* She noted that, when she was fifteen years old, Appellant "spooned" her on a bed, put his hands in her shirt, and inserted his fingers in her vagina. *Id.* at 119. She immediately left the room and locked herself in the bathroom. *Id.* at 120.

The victim testified she did not tell anyone about the prior incidents, and she acknowledged she continued to "hang out" with Appellant. *Id.* She testified she neither gave Appellant consent to enter her bedroom after she fell asleep nor to have sexual contact with her on November 23, 2019. *Id.* at

122. She testified she did not give him consent to put his tongue on or fingers inside her vagina at any time prior to November 23, 2019. *Id.*

Kaytlynn testified that, during her senior year of high school in 2019, she spent time with the victim, and she knew Appellant. *Id.* at 157. Kaytlynn confirmed that, on November 22, 2019, at 9:00 or 9:30 p.m., she, the victim, and Kennedy went to a party, and they were drinking alcohol. *Id.* Kaytlynn testified the trio left the party at 11:00 or 11:30 p.m., and the victim was "very drunk." *Id.* Kennedy and Kaytlynn returned the victim to her home and helped her into her bedroom. *Id.* at 159. Aside from the trio, there were no other people in the victim's bedroom, and she did not invite anyone to the victim's home that evening. *Id.* Kaytlynn testified she helped the victim into bed, and her clothes were not torn. *Id.* at 160. Kaytlynn and Kennedy then left. *Id.*

Kennedy testified she is friends with the victim, and she knows Appellant. *Id.* at 164. She indicated Appellant and his friends would "drink and party" with the victim and her friends. *Id.* Kennedy confirmed she was with the victim and Kaytlynn on November 22, 2019, and the trio went to a party where they consumed alcohol. *Id.* at 165. Kennedy testified she did not drink too much, but the victim became very intoxicated. *Id.* Kennedy testified she and Kaytlynn took the victim home, and when they left, the victim was alone in her bedroom. *Id.* at 166. Kennedy indicated the victim's clothes were not torn, and she saw no one outside of the victim's house. *Id.*

Pennsylvania State Police Trooper Amos Glick testified he was on duty on November 23, 2019, when the police were contacted regarding the sexual assault of the victim. *Id.* at 172. The trooper directed a corporal to go to the hospital to collect the sexual assault forensic examination ("SAFE") kit for the victim, and the trooper went to the victim's bedroom to collect evidence. *Id.* Specifically, Trooper Glick took photos of the victim's bedroom, as well as collected her bed sheets and comforter, which were then sent to the police laboratory for DNA testing. *Id.* at 180. The trooper noted the SAFE kit, as well as the victim's clothes, were also sent for DNA testing. *Id.* He noted the process is time consuming, and it takes a relatively long time to receive DNA results from the laboratory. *Id.* at 175.

Trooper Glick testified he interviewed Kennedy and Kaytlynn. *Id.* The victim participated in a forensic interview[3] wherein she identified Appellant as a possible suspect. *Id.* Trooper Glick testified that he secured and executed a search warrant to seize DNA from Appellant on August 6, 2020. *Id.* at 185. Specifically, he obtained a buccal DNA swab from Appellant, and he sent the swab to the police laboratory for comparison purposes. *Id.* at 186.

Trooper Glick indicated he interviewed Appellant on August 6, 2020, and Appellant denied sexually assaulting the victim. *Id.* at 189. Appellant specifically told the trooper that "there has been no sexual contact whatsoever

_____

[3] The trooper noted a forensic interview is specifically for minors, and the goal is to extract responses from open-ended, non-leading questions.

- 7 -

between [him] and [the victim]." *Id.* Appellant told the trooper the victim was his family, and "he would never cross the line." *Id.* Trooper Glick noted Appellant denied providing the victim with alcohol, and Appellant told the trooper the victim is a "belligerent drunk." *Id.* at 190. Moreover, Appellant told the trooper that, during the night of the victim's assault, he was at his house all night with a friend, Darrin, and they never left because Appellant does not drink and drive. *Id.*

The next day, on August 7, 2020, Appellant telephoned Trooper Glick and reported he had lied about his relationship with the victim. *Id.* at 199. He indicated he wanted to meet with the trooper to discuss the matter further, and they made plans for Appellant to come to the state police barracks the next day. *Id.* However, Appellant failed to appear at the state police barracks the next day. *Id.* The trooper called Appellant and connected with him in early November of 2020. *Id.*

During an interview in November of 2020, Appellant told the trooper he needed to clarify that he did not have sex with the victim from November 22 to November 23, 2019; however, "in the days leading up to that weekend, he had a consensual relationship with [the victim] to include penile penetration, digital penetration." *Id.* at 200. Appellant was unable to recall specifically what day he and the victim had the alleged consensual sexual encounter. *Id.* However, Appellant reported that, whichever day he and the victim had alleged consensual sex, the victim sent him a text "inviting him over for sexual

contact." ***Id.*** at 204. The trooper testified he examined the victim's incoming and outgoing text messages, and there were no messages from the victim to Appellant inviting him to have sex with her. ***Id.***

Trooper Glick testified Appellant "was very vague and avoidant" regarding further questions about the alleged consensual sexual encounter. ***Id.*** at 200. However, Trooper Glick noted Appellant specifically advised him that, during the alleged consensual encounter, he did not ejaculate. ***Id.*** at 202. The trooper testified that semen matching Appellant's DNA was found on the victim's fitted bed sheet, so the trooper found it to be "important and of note" that Appellant denied he ever ejaculated during his alleged consensual encounter with the victim. ***Id.***

Moreover, during the November 2020 interview, Appellant told the trooper that, during the evening of November 22, 2019, to the morning of November 23, 2019, he was at RJ's house. ***Id.*** That is, he no longer contended he was at his own home all night. ***Id.***

Trooper Glick interviewed Darrin, as well as Appellant's friend, RJ. Darrin reported he and Appellant were "hanging out" together during the evening of November 22, 2019, and they went to RJ's house. ***Id.*** at 191. Darrin told the trooper he left RJ's house at 2:00 a.m. on November 23, 2019, and he could not account for Appellant's whereabouts thereafter. ***Id.*** RJ confirmed he was Appellant's friend; however, he was unable to recall his or Appellant's whereabouts from November 22, 2019, to November 23, 2019.

*Id.* The trooper indicated that Appellant's mother was unable to remember whether Appellant was home from November 22, 2019, to November 23, 2019. *Id.* Trooper Glick testified he received and executed a search warrant for Appellant's and the victim's cell phone data. *Id.* at 194.

Additionally, Trooper Glick testified that, after his interview with Appellant in November of 2020, the trooper informed the victim that Appellant reported he and she had consensual sex. *Id.* at 204. The victim denied she and Appellant had consensual sex, and the victim consented to calling Appellant while allowing the trooper to listen to the phone call without Appellant's knowledge. *Id.* at 206. During the phone conversation, Appellant told the victim that, since they are cousins, he would never sexually assault her. *Id.* at 207. The victim confronted Appellant with the DNA results from her bed sheets, and Appellant indicated he was confused as to how his semen could have gotten on her sheets. *Id.* at 208. Appellant made no reference to an alleged consensual sexual encounter with the victim. *Id.*

Ronald ("RJ") testified he is Appellant's friend, and he knows the victim. *Id.* at 267. He indicated that, during the evening of November 22, 2019, he was at a bar in Lancaster with friends, including Appellant, and at approximately midnight, his friends, including Appellant, went to RJ's house. *Id.* RJ testified he does not remember his friends leaving his house, but he went to sleep sometime between midnight and 3:00 a.m. *Id.* When he awoke at 11:00 a.m. on November 23, 2019, his friends were gone. *Id.* at 268. RJ

confirmed that he could not account for Appellant's whereabouts during the early morning hours of November 23, 2019, after he fell asleep. *Id.*

Darrin testified he is Appellant's friend, and during the evening of November 22, 2019, he, Appellant, and RJ were at a bar in Lancaster. *Id.* at 278. The trio went to RJ's house after the bar. *Id.* Darrin left RJ's house between midnight and 1:00 a.m. *Id.* at 279. He has no idea what Appellant did "from that point on" during the early morning hours of November 23, 2019. *Id.*

Rachel Boyd, R.N., testified she works as a SAFE nurse for the Lancaster General Hospital. She indicated she has specialized training to conduct head to toe examinations, as well as collect evidence and DNA from victims of sexual assaults. *Id.* at 286. She confirmed she collected evidence from the victim for a SAFE kit on November 23, 2019. *Id.* at 296. The victim presented at the hospital in the clothes she had been wearing during the attack, including underwear ripped in the vaginal area and leggings with a hole in the rear. *Id.* at 302. The nurse collected these clothes. *Id.*

Nurse Boyd noted the victim had fresh bruise marks on her right bicep and left knee. *Id.* at 303. Nurse Boyd conducted a vaginal examination, and she saw redness around the opening of the victim's cervix, as well as a white discharge in her vagina. *Id.* Per the SAFE kit requirements, Nurse Boyd swabbed inside and outside of the victim's cervix and provided the SAFE kit to the police. *Id.*

Alexandria Gambone, a forensic scientist with the Pennsylvania State Police Laboratory, testified she analyzed the SAFE kit, the victim's clothing, the bed sheets, and a comforter. *Id.* at 318. Ms. Gambone testified no seminal material was found from the victim's vaginal or oral samples. *Id.* at 321. However, "a spermatozoon was identified on the crotch panel of the underwear from [the victim]." *Id.* at 323. No seminal material was found on the victim's leggings. *Id.* "Spermatozoa were identified on an area of the staining on the fitted bed sheet." *Id.* at 325. No seminal material was found on the comforter. *Id.* She indicated she sent all items for DNA testing.

Cassandra Poponick, a forensic DNA scientist with the Pennsylvania State Police Laboratory, testified as an expert in DNA analysis. *Id.* at 335. Ms. Poponick testified she tested the items provided to her by Ms. Gambone using the DNA profiles of the victim and Appellant. *Id.* at 343. She indicated DNA testing of the spermatozoon on the crotch of the victim's underwear excluded Appellant but included an "unknown contributor." *Id.* Ms. Poponick noted that, since the sperm on the victim's underwear was a single sperm cell, it is "possible that DNA was transferred" in the laundry when someone else in the victim's household used the same washer or dryer as the victim. *Id.*

However, Ms. Poponick testified the non-sperm fraction of the underwear was also tested for DNA, and it matched the "DNA profile obtained from the known reference sample from [Appellant]." *Id.* at 344. Also, the non-sperm fraction of the fabric of the leggings in the torn area was tested for

DNA.  *Id.* at 345.  DNA was found, and Appellant could not be excluded as a potential contributor. *Id.*

Ms. Poponick testified the victim's fitted bed sheet tested positive for sperm in one area, and DNA testing of the sperm matched Appellant's DNA. *Id.* at 348.  Further, non-sperm DNA was found on the victim's fitted bed sheet, and this DNA matched Appellant's DNA.  *Id.* at 349.  Swabs from the victim's SAFE kit, including vaginal and external genitalia swabs, resulted in the finding of non-sperm DNA.  *Id.* at 350.  Ms. Poponick testified Appellant's Y chromosome was found in this DNA, and, thus, "neither [Appellant] nor any of his paternally related male relatives can be excluded" as contributors.  *Id.*

Lori Ann Mays testified that Appellant is her son, and she is close with her extended family in the Lancaster area, including the victim's family.  *Id.* at 368.  Ms. Mays indicated that, during December of 2019, April of 2020, and June of 2020, the families had large parties with both Appellant and the victim in attendance.  *Id.* at 376.  She did not notice anything abnormal in their interactions.  *Id.*

Appellant testified in his own defense.  Specifically, Appellant testified he is very close to his cousins in the Lancaster area, including the victim.  N.T., 12/6/23, at 6.  Appellant testified he went to a bar with his friends, RJ and Darrin, during the evening of November 22, 2019, and, throughout the evening, he texted the victim.  *Id.* at 14.  He noted he texted the victim that he was at a bar with his friends, but they communicated about having their

friends get together to drink alcohol. *Id.* at 15. However, Appellant testified that their groups of friends did not "hang out" that evening because Appellant was at a bar and the victim, as well as her friends, were under 21. *Id.* at 18.

Appellant testified that he, RJ, and Darrin left the bar at 2:00 a.m. on November 23, 2019, and they went to RJ's house. *Id.* at 20. Appellant denied going to the victim's house during the evening of November 22, 2019, or the morning of November 23, 2019. *Id.* at 21. He indicated the victim texted him during the morning of November 23, 2019, and asked him if he had been at her house. *Id.* at 22. Appellant testified he texted "no" because he did not go to her house. *Id.* Appellant testified he saw the victim at family parties many times after November of 2019. *Id.*

Appellant admitted that, when he talked to Trooper Glick in August of 2020, he was not "completely truthful with him" because his "memory was a little foggy." *Id.* at 28. Appellant testified that, approximately a year prior to November 22, 2019, he and the victim were "hanging out" at her house, smoking marijuana, and watching a movie. *Id.* at 31. Appellant testified that, while they watched the movie, the victim began "spooning" Appellant, directed his hands into her pants, and helped him put his finger into her vagina. *Id.* Appellant testified he and the victim had another similar encounter. *Id.* He indicated he did not report his relationship with the victim to Trooper Glick during his first interview because he was embarrassed. *Id.* at 32.

Appellant testified he had a second interview with Trooper Glick, and during this interview, he "came clean" about a consensual sexual encounter, which occurred between him and the victim in the week prior to November 22, 2019. *Id.* at 36. He indicated he and the victim were watching movies in her bedroom while smoking marijuana, and they started to "feel each other up." *Id.* at 38. He noted they started with their clothes on, but they then took their clothes off. *Id.* He testified they "had sex for a little bit," and they then felt "very awkward" because they realized it was "a mistake" since they are cousins. *Id.* Appellant reiterated he was not at the victim's house during the evening of November 22, 2019, or the early morning hours of November 23, 2019. *Id.* at 45. He specifically denied having any sexual contact with her during this time. *Id.*

Tom Beiser, the director of the cellular phone forensic laboratory with LATRO services, testified he reviewed cell phone records for the phone numbers associated with Appellant and the victim for the period of November 22, 2019, to November 23, 2019. *Id.* at 102, 130. Mr. Beiser testified that, to a reasonable degree of scientific certainty, the call detail records do not show any indication that Appellant's phone was anywhere in the vicinity of the victim's residence during the night of the incident. *Id.* at 154. However, Mr. Beiser also testified he "can't disprove" that Appellant was at the victim's residence during the night of the incident. *Id.* at 155.

Christopher Erb, a county detective with the Lancaster County District Attorney's Office, testified as a rebuttal expert witness for the Commonwealth. Detective Erb examined the call detail records from Appellant's and the victim's cell phones. He noted that, on November 23, 2019, at 12:27 a.m., Appellant called RJ's cell phone, and the call lasted 33 seconds. *Id.* Detective Erb indicated he found it strange that Appellant called RJ at this time because Appellant claimed he was with RJ at his house during this time. *Id.* Also, the detective noted Appellant's cell phone did not "ping" off the tower near RJ's house when he made the 12:27 a.m. call on November 23, 2019. *Id.* He also noted that Appellant's cell phone was "potentially out and about at 3:34 in the morning" on November 23, 2019, given the cell tower pings. *Id.* at 217-18. He admitted the cell phone records did not "prove or disprove" whether Appellant was at the victim's house during the time of the attack; however, the records revealed it was "possible." *Id.* at 218.

At the conclusion of all evidence, the jury convicted Appellant of the offenses *supra*. Following a hearing, on March 19, 2024, the trial court sentenced Appellant to an aggregate of three and one-half years to ten years in prison. The trial court also ordered Appellant to comply with the life-time registration requirements for Tier III under the Sex Offender Registration and

Notification Act ("SORNA").[4]  This timely counseled appeal followed on April 18, 2024.  All Pa.R.A.P. 1925 requirements have been met.

Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

1. Whether the evidence was insufficient to establish Defendant's guilt on all counts of the Information where the testimony was contradictory and vague, and the victim was unable to identify what, if anything, had happened, and who any perpetrator may have been?

2. Whether the Court erred when it allowed the Commonwealth's expert testimony despite the Commonwealth not presenting any expert report to Defense until the middle of the trial?

3. Whether the Court erred when it denied Defendant's motion to suppress evidence, as there were no specific, articulable facts within the knowledge of the affiant to support that evidence would be found by executing a search warrant for Appellant's DNA?

Appellant's Brief at 14 (suggested answers omitted).

In his first issue, Appellant contends the evidence was insufficient to sustain his convictions.  As with any claim that contests whether there was sufficient evidence to sustain a conviction, we employ a well-settled series of legal precepts:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not

_____

[4] 42 Pa.C.S.A. §§ 9799.10-9799.75.

- 17 -

preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa.Super. 2001) (citations and quotation marks omitted).

Appellant contends the evidence was insufficient to sustain his convictions for Count One (aggravated indecent assault-without consent) and Count Two (aggravated indecent assault-complainant unconscious). Specifically, Appellant claims there is no evidence he penetrated, however slight, the victim's genitals or anus with his body part.

Moreover, he contends the evidence was insufficient to sustain his convictions for Count Five (indecent assault-person unconscious) and Count Six (indecent assault-without consent). Specifically, Appellant contends the evidence was insufficient to show that he "touched the victim at all on the date alleged or that he penetrated any part of her genitals with any part of his body." Appellant's Brief at 34.

The aggravated indecent assault statute relevantly provides the following:

**(a) Offenses defined.--**Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:

(1) the person does so without the complainant's consent;

\*\*\*

(4) the complainant is unconscious or the person knows that the complainant is unaware that the penetration is occurring[.]

18 Pa.C.S.A. § 3125(a)(1), (4) (bold in original).

The indecent assault statute relevantly provides the following:

**(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

(1) the person does so without the complainant's consent;

\*\*\*

(4) the complainant is unconscious or the person knows that the complainant is unaware that the indecent contact is occurring[.]

18 Pa.C.S.A. § 3126(a)(1), (4) (bold in original).

The criminal statute defines "indecent contact" as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person."  18 Pa.C.S.A. § 3101.

Viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, the evidence reveals the victim went to sleep while very intoxicated, momentarily awoke to a dark figure in her room, and immediately fell back to sleep. When she fully awoke and got out of bed at 8:00 a.m., she noticed her leggings and underwear were ripped near her "private parts." N.T., 12/4/23-12/5/23, at 102. Her friends testified the victim's leggings and underwear were not ripped when they helped her into bed at approximately midnight.

Moreover, forensic analysis of the victim's clothes revealed non-sperm DNA in the victim's underwear, and this DNA matched the "DNA profile obtained from the known reference sample from [Appellant]." *Id.* at 344. Also, non-sperm DNA was found in the fabric of the leggings in the torn area, and DNA testing could not exclude Appellant as a potential contributor. *Id.* at 345. Additionally, the sexual assault occurred while the victim was in her bed, and, thus, her bed sheets were analyzed for DNA evidence. Her fitted bed sheet tested positive for sperm in one area, and DNA testing of the sperm matched Appellant's DNA. *Id.* at 348. Further, non-sperm DNA was found on the victim's fitted bed sheet, and this DNA matched Appellant's DNA. *Id.* at 349.

Additionally, the victim went to the hospital where a SAFE kit was collected on the day of the sexual assault. Forensic analysis of the victim's SAFE kit, including vaginal and external genitalia swabs, resulted in the finding

of non-sperm DNA. Ms. Poponick testified Appellant's Y chromosome was found in this DNA, and, thus, "neither [Appellant] nor any of his paternally related male relatives can be excluded" as contributors. *Id.* at 350.

Based on the aforementioned, we find no merit to Appellant's claim that there is insufficient evidence of penetration, however slight, of the victim's genitals or anus with Appellant's body part as is necessary for aggravated indecent assault. *See Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa.Super. 2015) ("Digital penetration is sufficient to support a conviction for aggravated indecent assault[.]"); *Commonwealth v. Ortiz*, 457 A.2d 559, 561 (Pa.Super. 1983) (holding "entrance in the labia is sufficient" to constitute penetration). Thus, the evidence is also sufficient to establish Appellant touched the sexual or other intimate parts of the victim as is necessary for indecent assault. *See* 18 Pa.C.S.A. § 3101.

As to Appellant's convictions for Count Three (unlawful contact with a minor-sexual offenses) and Count Four (corruption of minors), Appellant baldly claims that, since the evidence was insufficient to support his convictions on Count One and Count Two (the two counts of aggravated indecent assault), the evidence for his convictions for unlawful contact with a minor and corruption of minors must also necessarily be deemed insufficient. *See* Appellant's Brief at 33.

As indicated *supra*, there is ample evidence supporting Appellant's convictions for Count One and Count Two, and, thus, we find no merit to

Appellant's bald sufficiency claim as to Count Three and Count Four. Accordingly, we find no merit to Appellant's claims that the evidence was insufficient to sustain his convictions.

In his next issue, Appellant claims the trial court erred in permitting the Commonwealth to present the expert testimony of Detective Erb in rebuttal to Appellant's expert, Mr. Beiser, as it relates to Appellant's text messages and cell phone data.

Initially, we note it is well settled that evidentiary rulings are within the sound discretion of the trial court. *Commonwealth v. DiStefano*, 670 Pa. 347, 265 A.3d 290, 297 (2021). The admissibility of "expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." *Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013) (citation omitted). Rebuttal testimony is admissible to discredit the defense's expert witness and, in doing so, may repeat some of the prior testimony given. *Commonwealth v. Yale*, 150 A.3d 979, 983 (Pa.Super. 2016).

Here, on appeal, Appellant has not developed an argument challenging whether Detective Erb was qualified to be a rebuttal expert or whether his testimony was within the scope of proper rebuttal testimony. Rather, Appellant claims he received late notice of the Commonwealth's intent to call Detective Erb as a rebuttal witness, as well as late notice of his expert report.

Thus, Appellant claims the Commonwealth violated Pennsylvania Rule of Criminal Procedure 573, which governs pre-trial discovery.[5]

Here, in support of his appellate issue, Appellant points to the following exchange, which occurred prior to Detective Erb's rebuttal testimony:

> (The following occurred at sidebar:)
>
> [DEFENSE COUNSEL]: Judge, I just wanted to put on the record that after our discussion in chambers, I understand how the Court is intending to rule on the matter; however, I did want to make an objection as to the paragraph contained in the report that I received today. I understand the Commonwealth is going to attempt to introduce regarding the opinion of the detective that it is consistent with the defendant having left the victim's home at 3 a.m.
>
> THE COURT: We're gonna [*sic*] take a break.
>
> [DEFENSE COUNSEL]: Okay.
>
> (Sidebar discussion ended.)
>
> THE COURT: We're going to take a break right now of at least 10 minutes. Plan to come back at approximately 2:25. Again, don't discuss the case. There's some things we need to talk about at this point. All right. Thank you.
>
> (The jury left the courtroom).
>
> THE COURT: All right. Go ahead.

---

[5] We note Appellant cites to *Commonwealth v. Dunn*, --- Pa. ---, 300 A.3d 324 (2023) (plurality), for the proposition that "the Pennsylvania Supreme Court all determined that the Commonwealth's failure to turn over an expert report prior to trial violated the pre-trial discovery rules, but remained divided as to whether, in that particular case, there was prejudice to the defendant." Appellant's Brief at 35.

Appellant does not specifically address the precedential value of *Dunn*, which is a plurality decision. Generally, plurality decisions of our Supreme Court do not constitute binding precedent. *Commonwealth v. Baldwin*, 604 Pa. 34, 985 A.2d 830, 835 (2009). In any event, even if *Dunn* is binding and applicable, we conclude Appellant is not entitled to relief for the reasons discussed *infra*.

[DEFENSE COUNSEL]: Your Honor, just so that the record is clear, I received the report from the Commonwealth today that I understand will generally be testified to in rebuttal.

Specifically, I would note that I have an objection to the characterization of the testimony in the second-to-last paragraph regarding one could believe that a number of things happened, some of which were not introduced into evidence and some of which I believe are pure speculation as to stumbling around in the dark and finding a car that was parked somewhere, as well as that somebody left at 3 a.m., which I don't believe has been testified to in any way in court.

So, I just wanted to note for the record that if that were to come in, I do have an objection to that specific testimony. But I—I certainly understand that it's rebuttal and not—a full report has not been provided; however, that portion, I believe is essentially, you know, back-dooring information in that I believe should have been provided in the case-in-chief.

[THE PROSECUTOR]: Judge, the report being referenced is a Cody report, a police report indicating what Detective Christopher Erb analyzed. It is not a report that will be entered into evidence or reviewed with the jury. It's simply a documentation of his analysis, and his work on the case. That report would not have been provided to defense as defense was notified in advance due to the last-minute nature of receiving the expert report of the defendant.

And then, also, this is purely a rebuttal witness. The defense expert I was told would just be referencing or analyzing the data. He did actually, in fact, on the stand give some opinion about the defendant's location and the ability of us to determine the defendant's location despite referencing zero data points with which to do that. He's using this data to corroborate the defendant's location on the day before and the night of. I have the right to rebuttal to have my expert witness also use that data to outline what the defense expert left out and, additionally, if there's any corroboration or consistency between the data and the victim's account, provide that. That is all he will be testifying to. There will be no speculation. There will be no absolutes in terms of facts not in the record. He will be analyzing the data and referencing anything that might be consistent in either account.

THE COURT: Well, we discussed this in a conference before we came out to hear the testimony of the defense cell phone expert. We talked to counsel about the concern we had with one sentence in the police report of Detective Erb. It was agreed that sentence

would be changed from an absolute to a maybe or a may possibly occur with regard to the location of the defendant's phone as well as the time that the defendant's phone may have been near the—possibly near the defendant's—or the victim's residence.

We also note that the defense report was apparently generated and given to the Commonwealth I believe on November 17. The Commonwealth attorney recounted how she had received it then, and then attempted during a short three-day Thanksgiving week to work get a response from the Pennsylvania State Police as well as working with her own county detective department to come up with a response, or at least analyze the report of the defense expert, which we still haven't heard why it took so long to produce that from the defendant.

But to come up with a response, if necessary, to rebut what the defendant expert was saying.

We also note that apparently the Commonwealth's counsel had offered to extend or at least continue this case until the next week to begin December 11th to give herself time to produce this police report from Detective Erb, as well as give the defendant's expert and defense counsel time to respond to it, to give them extra time to respond to it from what I heard from the Commonwealth's attorney. The defense attorney didn't want to do that. The defense attorney said we can only go on December 4th, not December 11th.

Taking everything into account and hearing the opinion of the defendant's cell phone expert saying that there was nothing to indicate the defendant's phone was in the area of the residence of the victim on the evening that this incident occurred based upon the defendant's cell phone record analysis, also him apparently saying there's nothing to disprove this, we believe that this is ripe and open to have the Commonwealth have Detective Erb as a rebuttal witness in this matter.

We also had informed defense counsel and talked about this during the conference about whether the defense expert should even testify with—knowing that this may open the door to Detective Erb's rebuttal testimony. So, we're going to go ahead with Detective Erb's testimony. All right. Thank you.

N.T., 12/6/23, at 172-76.

Initially, we note our review of the aforementioned exchange reveals Appellant did not allege a discovery violation in the trial court. That is, Appellant did not object specifically to Detective Erb's expert rebuttal testimony on the basis the Commonwealth failed to disclose his identity and provide his report prior to trial. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

In any event, assuming, *arguendo*, Appellant preserved his alleged discovery violation claim, and the Commonwealth violated the discovery rules by failing to disclose its intent to call Detective Erb and provide his expert report until mid-trial, we conclude Appellant has failed to demonstrate he is entitled to relief.

When a discovery violation occurs, the court has very broad discretion in choosing an appropriate remedy. **Commonwealth v. Feflie**, 581 A.2d 636 (Pa.Super. 1990). Moreover, a defendant seeking relief from tardy disclosure under the rule still must demonstrate prejudice. **Commonwealth v. Rodgers**, 500 Pa. 405, 456 A.2d 1352 (1983). Generally, a short continuance is deemed sufficient to eradicate possible prejudice and enable the defendant to assimilate the new information. **See Feflie**, **supra**.

Here, as it pertains to prejudice, Appellant complains he "had absolutely no opportunity to prepare for [the] cross-examination of Detective Erb, as the report was received mid-trial." Appellant's Brief at 37. He also contends the Commonwealth was given an "unfair advantage" because Detective Erb had

the ability to review Mr. Beiler's report before the detective testified whereas Mr. Beiler did not have the same opportunity. *Id.*

The record reveals that, when the defense provided Mr. Beiler's report to the Commonwealth on the eve of trial, the Commonwealth offered to seek a continuance to "give [the Commonwealth] time to produce the [expert] report from Detective Erb, as well as give the defendant's expert and defense counsel time to respond to it, to give them extra time to respond to it[.]" N.T., 12/6/23, at 175. However, Appellant declined the continuance and insisted the trial proceed as scheduled. *Id.* By refusing the continuance, Appellant cannot now complain he needed more time to prepare for Detective Erb's cross-examination or aver it was "unfair" that Mr. Beiler did not have a chance to review Detective Erb's expert report prior to taking the stand.[6]

_____

[6] We note that discovery violations do not automatically entitle an appellant to a new trial; the appellant must demonstrate that the violation resulted in prejudice. *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 298 (1998). Our case law suggests that prejudice in this context requires an appellant to demonstrate that a timelier disclosure would have affected his trial strategy or otherwise resulted in prejudice in the typical outcome determinative sense. *See Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 637-38 (1991); *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 512-13 (1995).

In the case *sub judice*, we conclude Appellant has not demonstrated that a timelier disclosure would have affected his trial strategy, particularly given that he refused the continuance. Moreover, even assuming, *arguendo*, Detective Erb should not have been permitted to testify as a rebuttal witness, we find any error with regard thereto did not contribute to the verdict and the properly admitted evidence of guilt was overwhelming. Simply put, Detective Erb admitted the cell phone records did not "prove or disprove" whether Appellant was at the victim's house during the time of the attack, and the cell phone records suggested only that it was "possible." N.T., 12/6/23, at 218.

In his last issue, Appellant contends the trial court erred in denying his pre-trial motion seeking to suppress the evidence obtained from the execution of a search warrant for Appellant's DNA. Specifically, Appellant avers that, looking at the four corners of the search warrant, there was insufficient probable cause to establish that a crime was committed, let alone that Appellant was the perpetrator, to support the seizure of his DNA.

When reviewing suppression decisions, our standard of review is limited.

> When reviewing an order denying a motion to suppress evidence, we must determine whether the evidence of record supports the factual findings of the trial court. In making this determination, this Court may only consider the Commonwealth's evidence and the defendant's evidence that remains uncontradicted. We view the Commonwealth's evidence, not as a layperson, but through the eyes of a trained police officer. We do not review the evidence piecemeal, but consider the totality of the circumstances in assessing whether probable cause existed. Additionally, it is exclusively within the province of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony. If the evidence supports the findings of the trial court, those findings bind us, and we may reverse only if the suppression court drew erroneous legal conclusions from the evidence.

*Commonwealth v. Gallagher*, 896 A.2d 583, 584-85 (Pa.Super. 2006) (quotation omitted).

To be valid, a search warrant must be supported by probable cause. *Commonwealth v. Jacoby*, 642 Pa. 623, 170 A.3d 1065, 1081 (2017). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief

that a search should be conducted." ***Commonwealth v. Leed***, 646 Pa. 602, 186 A.3d 405, 413 (2018) (citation omitted). "Probable cause is based on a finding of probability and does not require a *prima facie* showing of criminal activity." ***Commonwealth v. Huntington***, 924 A.2d 1252, 1256 (Pa.Super. 2007) (citation omitted).

As our Supreme Court has stated:

> The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him,…there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for…[concluding]" that probable cause existed.

***Commonwealth v. Housman***, 604 Pa. 596, 986 A.2d 822, 843 (2009) (citation omitted). Importantly, "[t]he issuing authority in determining whether probable cause has been established, may not consider any evidence outside the affidavits." ***Leed***, ***supra***, 186 A.3d at 412. In other words, the four corners of the affidavit attached to the search warrant application must provide the reviewing magistrate with a sufficient basis for finding probable cause. ***Id.***

Moreover, in engaging in our review we are mindful of the following:

> The Supreme Court of the United States has instructed "that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." Indeed, a magistrate's probable cause determination should receive deference from the reviewing courts. In keeping with the Fourth Amendment's strong preference for warrants, "courts should not invalidate…warrants by interpreting affidavits in a hyper-technical, rather than a commonsense, manner."

- 29 -

*Leed*, *supra*, 186 A.3d at 413 (citation omitted).

With the foregoing legal precepts in mind, we begin by examining the affidavit of probable cause attached to the application for the search warrant in the case *sub judice*. Relevantly, the affidavit of probable cause provides as follows:

> 1.    Your Affiant is a Trooper with the Pennsylvania State Police currently assigned to the Criminal Investigation Unit at Troop J-Lancaster Barracks located in Lancaster County.  Your Affiant has been employed by the Pennsylvania State Police for over nine years.  During this time with the Department, he has conducted and assisted with numerous investigations that include-robberies, burglaries, thefts, narcotic arrests, sex offenses, homicides, and death investigations….As a Trooper with the Pennsylvania State Police, he is empowered to conduct investigations and make arrests for violations enumerated in the Pennsylvania Crimes Code[.]
>
> 2.    On November 23, 2019, the Pennsylvania State Police-Lancaster Barracks was notified of a rape that occurred at [***] Witmer Twin Lane, Conestoga Township[.] The victim, a 17-year-old female, consented to a sexual assault examination at Lancaster General Hospital.  The victim reported that she attended a party somewhere in Lancaster City with several friends on the night of November 22, 2020.  While at the party, the victim consumed various alcoholic beverages causing her to become inebriated.
>
> 3.    The victim's friend (Kennedy [***]) described how the victim was so drunk that she was stumbling around while at the party. [Kennedy] drove the victim home from the party then helped the victim get inside her home.  [Kennedy] described how the victim needed help getting to her bed.
>
> 4.    The victim related she had no recollection of events after leaving the party and does not remember the drive back to her home.  The victim said she vaguely remembers waking up in the middle of the night vomiting several times, then noticed a figure of a black male exit her bedroom through the door that leads to the outside.  She heard the shuffle of his feet and the doorknob jingle as he left the room.

5. The victim related she thought the figure was possibly her cousin, who is a black male, ([Appellant]). The victim reported waking up fully clothed, but her leggings and underwear were ripped in the crotch area.

6. The victim explained that earlier in [the] day, she and [Appellant] had discussed meeting at the victim's home after the party. The victim said [Appellant] had spent a lot of time at her home in the past and that he knew how to get inside and knew where her room was located. The victim disclosed an occasion where [Appellant] licked her feet when she was 15 or 16 years of age. The victim also disclosed how [Appellant] had touched her breasts and vagina several years ago when she was 14 or 15 years of age. The victim denied having any consensual sexual contact in the weeks prior to this incident occurring.

7. On June 17, 2020, your Affiant received a laboratory report from the Pennsylvania State Police-Forensic DNA Division that states a Y chromosome DNA haplotype from an unidentified individual was obtained from vaginal swabs and external genitalia swabs. Both swabs were collected during the sexual assault examination the victim consented to on November 23, 2020.

8. Your Affiant knows that DNA or Deoxyribonucleic Acid is a biological material that is unique and specific to one person only (or to identical twins) similar to a type of genetic fingerprint. Comparison of a known person's DNA profile to a DNA profile recovered from evidence can positively identify that person as the contributor of the recovered profile.

9. Your Affiant believes there is Probable Cause that evidence relating to the sexual assault of the victim by [Appellant] is being concealed in the body of [Appellant].

10. Based upon the aforementioned facts and my training and experience, your Affiant respectfully requests the Honorable Court to grant a search warrant for the search and seizure of a sample of Deoxyribonucleic Acid or DNA from the body of [Appellant]…for the purpose of comparing it to the DNA profile recovered from the Victim's sexual assault evidence collection kit.

Search Warrant Application, Affidavit of Probable Cause, dated 8/6/20

(unnecessary capitalization omitted).

We conclude that, within the four corners of the affidavit, a substantial basis existed for the magistrate to find probable cause. **See Jacoby**, **supra**. As the trial court held:

> The totality of the circumstances described within the four corners of the affidavit established probable cause for the issuance of the search warrant. The affidavit described the evidence gathered by law enforcement throughout the investigation, including the fact that the victim believed her cousin, Appellant, was the perpetrator, based on past non-consensual sexual acts committed against her, the fact he had access to her bedroom,…and she saw a black man leaving her room in the middle of the night. This, coupled with the fact that male DNA was found in her vagina [and] on her external genitalia,…showed that probable cause existed, based on the affidavit of probable cause, to issue a search warrant for Appellant's DNA.

Trial Court Opinion, filed 7/2/24, at 24

We agree with the trial court that the affiant, Trooper Glick, articulated specific and individualized facts to establish probable cause to obtain a sample of Appellant's DNA to compare to the DNA found in the victim's vagina and on her external genitalia. Under the totality of the circumstances, the affidavit set forth the victim's inebriation, the presence of a man in her room during the night, and the condition of her clothing upon awaking. The victim denied having consensual sexual contact, and the presence of Y chromosome DNA in her vagina and external genitalia, which was collected during a sexual assault examination at the hospital, established a probability that the victim was sexually assaulted. As indicated *supra*, and contrary to Appellant's suggestion, "[p]robable cause is based on a finding of probability and does

not require a *prima facie* showing of criminal activity." ***Huntington***, 924 A.2d at 1256 (citation omitted).

As to the identity of the suspect, we remind Appellant that "the police need not rule out all other possibilities in establishing probable cause for the issuance of a search warrant." ***Commonwealth v. Rapak***, 138 A.3d 666, 672-73 (Pa.Super. 2016) (citation omitted). Here, as Trooper Glick set forth in the affidavit of probable cause, the victim explained that she suspected her attacker was her cousin, Appellant. She explained that, earlier in the day, the two discussed meeting at her home after the victim returned from a party. She also informed Trooper Glick of Appellant's past unwanted sexual actions towards her, as well as the fact he was often in and familiar with her home.

Based on a review of the four corners of the affidavit, we conclude the search warrant was supported by probable cause. ***See Jacoby***, ***supra***. Accordingly, there is no merit to Appellant's last issue.

For all of the foregoing reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>06/09/2025</u>